STATE of Missouri, Plaintiff–
Respondent,

v.

Twyla Michelle SCHWARTZ,
Defendant–Appellant.

No. 19373.

Missouri Court of Appeals,
Southern District,
Division Two.

May 24, 1995.

Gary E. Brotherton, Office of the State Public Defender, Columbia, for defendant-appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Christine M. Kocot, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

GARRISON, Presiding Judge.

Defendant was sentenced to ten years' imprisonment after her conviction by a jury of the Class A felony of assault in the first degree, § 565.050.[1] The offense dealt with injuries to Defendant's two and one-half month old son, Cory, while she was living with her boyfriend, Danny Calhoon (Danny). On this appeal, she contends that there was insufficient evidence to support the verdict, and that the trial court erred in admitting in evidence a letter she wrote to Danny after her arrest.

Defendant and Cory had been living with Danny since December 15, 1992. They first lived in Cuba, Missouri but moved to Rolla on January 15, 1993. On January 18, 1993, Defendant and Danny took Cory to the Phelps County Regional Medical Center in Rolla because his stomach was swollen, he was pale and clammy, and he seemed to have a temperature. The attending physician testified that Cory was in extreme respiratory distress, was in shock, and had bruises to his chest, neck, face, jaw, forehead, penis and genitalia. The doctor testified, however, that while the bruises to the face and genitalia were not life threatening, it was necessary that they institute lifesaving measures by establishing a good airway and bringing his blood pressure back to normal. Defendant told the doctor that Cory had fallen off the couch twice, landing on some toys. The doctor testified, however, that this explanation would not account for Cory's injuries and he felt that the child was the subject of at least neglect or probable child abuse. The decision was made to airlift Cory to St. Louis Children's Hospital that night where he was admitted to the pediatric intensive care unit.

At Children's Hospital, Cory's diagnosis included superficial bruises to the face, neck

1. All references to statutes are to RSMo1994.

and left eyelid; bruises over the chest; a circumferential bruise around the shaft of the penis; bruises to the inside of the right lower leg; bilateral rib fractures; fluid collection in the lower part of the chest and abdomen suggesting damage to the spleen; damage to the adrenal glands; and a fracture to the right lower leg. A few days later when he was taken off a ventilator, a broken nose was discovered along with a collection of blood near his nose that was infected and was obstructing his breathing. Based on blood studies which were made when Cory arrived at the hospital, the attending physician testified that it appeared the injuries occurred within twelve to twenty-four hours prior to his admission; more than one blow would have been needed to cause all of the injuries and bruises; and the injuries, which were life threatening, were the result of severe trauma. He also testified that the injuries were not consistent with Cory having fallen from a couch.

A social worker at St. Louis Children's Hospital testified that she spoke with Defendant and Danny and was told that they had left Cory with friends of theirs, Frank Key and Darlene Chew, seven to ten days earlier for a period of two and a half hours. When they picked him up, he had a black and blue mark on the back of his head, his ribs were tender and he was shaking all over. Defendant also told her that Cory had rolled off the couch twice two days earlier which might explain the bruises to the face, and that she might have fractured the ribs and caused the abdominal injuries when she pressed on his stomach when it was hard and swollen. Defendant maintained the same story even when the social worker told her that the injuries were of recent origin.

On January 21, Detective Day of the Rolla Police Department interviewed Defendant in the presence of Brenda Wilkinson, a Division of Family Services (DFS) worker for Crawford County, and Teresa Winemiller, a DFS worker in Phelps County. Defendant initially told him that when she and Danny picked Cory up at the residence of Frank Key and Darlene Chew the previous week he was crying and shaking all over; later his stom-

ach became hard and began swelling; and he was taken to the hospital when he became clammy, developed a temperature and had trouble breathing. She also reiterated the story that Cory fell off the couch twice on January 17, bruising his face.

She later recanted these statements, however, admitting that the stories about Frank Key and Darlene Chew were false. She told Detective Day that Danny had problems controlling his temper and on several occasions struck Cory because he was upset with Cory's crying.[2] She described a series of physical abuses by Danny beginning about a week after she and Cory arrived to live with him. Included were instances of Danny throwing Cory onto the couch; tying strands of her hair around his penis; "smacking" Cory's face with his hand which left red marks; shaking Cory; sticking rags in his mouth when he cried; slapping Cory's head, face and mouth 15 to 20 times; hitting him in the head with his fist two or three times, including once in the face causing his nose to bleed; holding him by the neck while shaking him; and hitting him in the stomach with his fist two or three hours before Cory's stomach began swelling.

During the interview, Defendant admitted having lost her temper a few times and swatting Cory on his buttocks but claimed it always occurred when he had a diaper on and no marks were left. She also said that "I have screamed at Cory before . . . and I have hit him" about ten times. When asked if she felt bad because she hit him harder than she should have she said, "Yeah, I hit him ya' know, I'll spank him ya' know and then I'll lay him down, then a few minutes later I'm back in there ya' know, picking him up and loving on him." She denied hitting Cory in the stomach "because any time I've hit him, it has been on his butt and I've been holding him."

Detective Day testified that during the interview Defendant admitted hitting Cory in the head and face as well as on his buttocks, that she hit him too hard, and that these events occurred while they lived both in Cuba and Rolla. While the interview with

2. The evidence indicated that Cory had colic and cried much of the time.

Detective Day was tape recorded, no such statements were contained on the tape or in the transcript. Detective Day claimed that the statements about Defendant hitting Cory on the face and head occurred after the first side of the tape ran out and before he turned the tape over in the recorder. The transcript of the interview indicates, however, that the first side of the tape ended in mid-sentence when Day was interrogating her about the hair she said Danny wrapped around Cory's penis. When the tape continues, Day said:

> Shelly, I just changed the sides of the tape recorder, okay, and I realized we had been talking here when it stopped and I want to make sure that we get everything on the tape here, okay. And, excuse me for interrupting, I just want to back and make sure that we cover this part again where you told us, because we're going to need this to help protect you, we're going to need this information, okay. And you told us and tell me if I'm not accurate here, you told us that you saw Danny tie the strands of hair around Cory's penis.

Day, however, apparently prepared a report from memory four days later in which he stated that Defendant admitted hitting Cory in the face and head. Although Day testified that he went to the hospital social worker after the interview and told her that both Defendant and Danny had confessed to beating the baby, the social worker testified that Day told her that Danny had admitted to all of the physical abuse and Defendant had admitted knowing that he was abusing the baby and failed to protect him. She said that if Day had told her that Defendant admitted striking Cory in the head and face she would have placed that information in her social services note in the hospital records. That note contained no such information.

Both DFS workers Winemiller and Wilkinson took notes during the interview with Defendant. Ms. Winemiller did not remember Defendant saying she had struck Cory in the mouth, face or head, and her report,

prepared before her notes were destroyed, contained no such information. Ms. Wilkinson also wrote a report about the interview which contained no indication that Defendant said those things, although she testified that she remembered Defendant saying she had spanked the child without a diaper and had slapped his face. She admitted, however, that those statements had not been in her notes.

When the hospital social worker received the report of the interviews with Defendant and Danny,[3] she informed them that they would not be permitted to see Cory in the hospital and they were asked to leave. They did so, and the next night Defendant called her mother in St. Joseph, saying she was in Cameron, Missouri and was on her way to Des Moines, Iowa because Cory had been flown there for a lung transplant. The next day she called again saying the baby had been taken from her because the authorities thought she had abused him, wanting money sent to "Mr. and Mrs. Davis" at a motel in New Hampton, Iowa, and saying she and Danny were going to "Canada or somewhere" to get married. They were arrested in New Hampton three days later.[4] The information charging Defendant read:

> ... on or about January 17, 1993, in the County of Phelps, State of Missouri, the defendant knowingly caused serious physical injury to Cory Scott Schwartz, DOB: 10/30/92 by hitting him in the head and striking him in the abdomen and body. Further, that with the purpose of promoting or furthering the commission of assault in the first degree the defendant acted together with and aided Danny Ray Calhoon as defined by Sections 562.036 and 562.041 RSMo.

In her first point relied on Defendant contends that the trial court erred in overruling her motion for acquittal at the close of all the evidence because the state failed to produce sufficient evidence from which a rational trier of fact could have found either that she inflicted serious physical injury to Cory or that

3. The contents of the interview with Danny are not before us.

4. This was apparently on a warrant issued by Phelps County for the charge which is the subject of this appeal.

she aided Danny in doing so. She argues that the evidence established merely that she knew that Danny was hitting Cory and that she failed to remove him from that environment.

A person commits the crime of assault in the first degree if he attempts to kill or knowingly causes or attempts to cause serious physical injury to another person. § 565.050. A person "acts knowingly," or with knowledge: (1) With respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist; or (2) With respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result. § 562.016. "Serious physical injury" is defined in § 565.002 as "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body."

When the sufficiency of the evidence is challenged, our review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993). We accept as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence, and disregard all evidence and inferences to the contrary. *Id.*

Defendant does not contend that there was a lack of substantial evidence that Cory sustained "serious physical injury," but only that the evidence was insufficient that the injuries were inflicted by her. She argues that the only substantial evidence was that she spanked Cory with his diaper on, and while she may have done so too hard, there was no evidence that this caused any serious physical injury. She discounts as not credible Detective Day's testimony that she admitted, during the break in the taped interview, that she hit Cory in the face and head. Notwithstanding the fact that we might otherwise agree with this conclusion were we the trier of fact, we are confined by the fact that credibility issues are for the jury and not us. *See State v. Thomas*, 806 S.W.2d 138, 140 (Mo.App.S.D.1991). Our examination is to determine whether there was

evidence, if believed, from which the jury could find Defendant guilty beyond a reasonable doubt. As presented by Defendant, the issue is whether there was sufficient evidence that she inflicted serious physical injury to Cory.

If believed, Detective Day's testimony provided evidence that Defendant admitted hitting Cory in the face and head when they lived in Cuba and also at Rolla. They moved to Rolla only three days before Cory was admitted to the hospital. At the St. Louis Children's Hospital he was diagnosed with a broken nose which caused an accumulation of blood which became infected, caused a breathing obstruction, and caused a re-admission to the intensive care unit of the hospital. The jury could have found that hitting a two and one-half month old child in the face was an attempt to cause serious physical injury in that it was practically certain to cause that result and this was done "knowingly." Defendant also admitted at trial that the broken nose was caused by either her or Danny, but contended that it wasn't her. The jury was not required to believe Defendant's testimony, however, that she did not strike Cory in the face or head or cause the broken nose. *See State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989).

A permissible inference of guilt may be drawn from acts or conduct of an accused subsequent to an offense if they tend to show a consciousness of guilt by reason of a desire to conceal the offense or role therein. *State v. Fitzgerald*, 778 S.W.2d 689, 691 (Mo.App.E.D.1989). In the instant case, Defendant told medical personnel and Detective Day that Frank Key and Darlene Chew had abused Cory, a statement she later admitted was false. Exculpatory statements which are proven to be false evidence a consciousness of guilt and bear directly on the issue of guilt or innocence. *State v. Dulany*, 781 S.W.2d at 55; *State v. Rodden*, 728 S.W.2d 212, 219 (Mo. banc 1987).

Defendant also left the state intending, according to her mother's testimony, to go to Canada. Flight does not establish a defendant's guilty knowledge of a particular crime in comparison to other possible charges, *State v. Moore*, 729 S.W.2d 239, 240–241 (Mo.App.E.D.1987), and is alone in-

sufficient to support a conviction. *State v. Castaldi,* 386 S.W.2d 392, 395 (Mo.1965). Flight, however, can be a circumstance to be considered in connection with other evidence of the commission of a crime, *Id.,* and shows a consciousness of guilt contrary to a theory of innocence. *State v. Dulany,* 781 S.W.2d at 55. Coupled with other evidence of guilt, flight can be considered in support of a conviction. *State v. Harrison,* 698 S.W.2d 564, 566 (Mo.App.E.D.1985).

 In the instant case, we find that there was sufficient evidence for the jury to find Defendant guilty of assault in the first degree. Because of the manner in which the issue is presented in this point, we need not examine whether there was sufficient evidence to have also found her guilty based on responsibility for the conduct of Danny. The first point is denied.

In her second point, Defendant contends that the trial court erred in admitting a letter she wrote to Danny while they were incarcerated in Iowa which referred to sexual contact with Cory. Her theory is that the letter was evidence of uncharged crimes which were irrelevant to the charge of first degree assault and was introduced for the purpose of inflaming the jury by portraying her as a bad person more likely to have committed the offense.

The letter in question included the following:

> You know as well as I do that no one had sex with Cory. I would never get that desperate to have sex with my son. If he was messed with it happened over at Frank and Darlene's. I'm sorry to say it but all of this happened after they watched.

Defendant's attorney objected that there was no charge of sexual abuse in the case; the State had no other letter putting this in context or making this portion of the letter relevant; and it would inflame the passions of the jury against Defendant.[5]

 Evidence runs afoul of the general rule that defendants have a right to be tried only for the offense for which they are charged if it shows that the defendant has committed, been accused of, been convicted of or definitely associated with another crime or crimes. *State v. Hornbuckle,* 769 S.W.2d 89, 96 (Mo. banc 1989). Vague references, however, cannot be characterized as clear evidence associating a defendant with other crimes. *Id.*

The trial court has broad discretion in determining whether to admit or exclude evidence and, absent a clear abuse of discretion, an appellate court will not interfere with the trial court's ruling on admissibility of evidence. *State v. Davis,* 860 S.W.2d 369, 375 (Mo.App.E.D.1993). In the instant case, the letter in question did not imply that Defendant had been charged with sexually abusing Cory. The comment could have been interpreted as referring to the fact that Cory had bruises on his penis. We are unable to conclude that the trial court abused its discretion as alleged in this point. The point is, therefore, denied.

The judgment is affirmed.

CROW and PARRISH, JJ., concur.

---

5. Defendant's trial attorney originally objected to all of the quoted portion of the letter but later withdrew his objection to the last two sentences.