**STATE of Missouri, Plaintiff–Respondent,**

v.

**Jason C. SILVEY, Defendant–Appellant.**

**Jason C. SILVEY, Movant–Appellant,**

v.

**STATE of Missouri, Respondent–Respondent.**

Nos. 20707, 22025.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 14, 1998.

Application for Transfer Denied
Nov. 4, 1998.

Application for Transfer Denied
Dec. 22, 1998.

David Simpson, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for Respondent.

SHRUM, Presiding Judge.

A jury convicted Jason C. Silvey ("Defendant") of two counts of abuse of a child, a class C felony, under § 568.060.1(1), RSMo 1994,[1] for knowingly inflicting cruel and inhuman punishment on each of his two stepsons. The jury recommended a sentence of three years in prison for each violation. The trial court ordered that the recommended sentences be served consecutively. In No. 20707, Defendant appeals from the judgment of conviction and sentence claiming there was insufficient evidence to establish that he inflicted "cruel and inhuman punishment" on the victims. We affirm in No. 20707.

1. All statutory references are to RSMo 1994 unless otherwise indicated.

After sentencing, Defendant sought post-conviction relief under Rule 29.15. In No. 22025 he appeals the denial of that motion. However, Defendant's brief contains neither a point relied on nor an argument charging that the motion court erred. Accordingly, we dismiss his appeal in No. 22025.[2]

### FACTS

In March 1993, Defendant lived with his wife and her two sons, James and Jesse Floyd, near Lebanon, Missouri. At the time, James was in the second grade and Jesse was in the fourth grade. On March 10, 1993, a teacher's observation of bruises on James's arm led to James being interviewed by a school counselor. When the counselor asked, "What happened, James? Who did this?" James answered, "My dad," apparently referring to Defendant, his stepfather. Thereon, the counselor contacted the Missouri Division of Family Services ("DFS") to report her suspicion that James had been abused by his stepfather.

Responding to the counselor's report, an investigator for DFS, and a deputy sheriff met with James at his school. During the meeting, these investigators saw a number of severe bruises on James's arms, face, back, and buttocks. Later in the day, they also met with Jesse and found that he had multiple bruises on his arms and buttocks. After both victims were photographed and further questioned, the deputy sheriff drove to Defendant's residence and arrested him.

On March 11, 1993, Dr. Jolene Ostwinkle examined both boys. During her examination of James, she observed numerous bruises on his arms, chin, back, buttocks, scrotum, thighs, and left knee. Based on their coloration, Dr. Ostwinkle believed the bruises varied somewhat in age, ranging from within three days to twelve or fourteen days old. In her examination notes, Dr. Ostwinkle described the bruising on James's buttocks as follows: "Buttocks, extensive dark purple covering entire area including gluteal cleft to a degree. Petechial interspersed." When she examined Jesse, Dr. Ostwinkle noted bruises on his chin, mandible, shoulder, ribs, arms, abdomen, buttocks, and thighs. With regard to the bruising on Jesse's buttocks, Dr. Ostwinkle's examination notes stated: "Buttocks, purple, extensive . . . . petechial hemorrhages." In both her examination notes and testimony, Dr. Ostwinkle concluded that the bruising she had observed on both James and Jesse was "consistent with child abuse."

At the time of trial, James Floyd was in fifth grade. He testified that he had been taken away from his family because "[m]y stepfather beat me." When asked how his stepfather had beaten him, James stated, "He made this big, long paddle and hit my bare bottom with it." Using his hands, James indicated that the paddle was approximately three feet long and one inch thick, and he stated that "it had holes in it, all over it." James stated that Defendant had "spanked" him "[a]s hard as he could" with the paddle. Although James could not remember the exact day of the spanking that had caused his bruising, he did recall receiving the spanking sometime before he was taken away from his family on March 10, 1993. He also remembered that on the day he was taken away, someone had taken pictures of bruises on his body, and he stated that the bruises had been "real dark red and black." James did not know why Defendant had spanked him. When asked how many times Defendant would swat him with the paddle when Defendant spanked him, James replied, "Like 40 times a day."

Jesse Floyd was in seventh grade at the time of trial. His testimony corroborated James's in most respects. Jesse remembered being taken to James's school and being questioned about both his and James's bruises on the day he and James had been "taken away." He also recalled that some-

2. In relevant part, Missouri Court Rule 29.15(m) (1998) provides that "[i]f sentence is pronounced prior to January 1, 1996, postconviction relief shall continue to be governed by the provisions of Rule 29.15 in effect on the date the motion was filed or December 31, 1995, whichever is earlier." Here, the trial court pronounced Defendant's sentence on December 22, 1995, and Defendant filed his motion for post-conviction relief on May 9, 1996. Consequently, Defendant's post-conviction motion is governed by Missouri Rules of Court (1995). Under Rule 29.15(*l*) (1995), this court was required to consolidate the two appeals.

one had photographed his bruises, and he indicated that he was shown the pictures of James's bruises as well. Jesse testified that Defendant had caused James's bruises by spanking James with a paddle. Jesse estimated that Defendant's paddle was one inch thick and four inches wide, and he stated that "it had holes drilled in it and had tape around a knot on it where [Defendant] said he didn't want it to break."

Jesse testified that Defendant had paddled James the night before the two boys were taken away. Jesse stated that Defendant "pulled [James's] pants down and leaned up against the couch and paddled him." When asked to describe Defendant's "swats," Jesse replied, "Ball bat swing." He said that Defendant hit James "many" times, although he did not know exactly how many. He also stated that during the spanking, James was "[s]quirming around, screaming and yelling, trying to move and trying to ask [Defendant] why, why he was getting spanked." Jesse testified that he did not know why Defendant had spanked James. Jesse also indicated that James had received the bruises to his arms when he tried "to protect himself from the paddle."

Jesse further testified that the bruises he carried on March 10 had been caused by Defendant, who had spanked him approximately three nights before. Defendant had made Jesse bend over and then hit him approximately fifteen times with the paddle described above. According to Jesse, Defendant took "[b]all bat swings" and hit him "[o]n the rear end and a little bit on the back and a little bit on the legs." Jesse did not know why Defendant had spanked him. The spanking left Jesse with "[b]ig black and purple bruises" on his buttocks.

Defendant testified on his own behalf and denied ever having used a wooden paddle to spank James and Jesse. He stated that he had punished the two boys by other means, including occasionally swatting them with his hand three to five times. Defendant also testified that, to his knowledge, he was the only person to have spanked either of the boys between January and March 1993. He denied having any knowledge of the existence or cause of the bruises on the boys.

Based on this and other evidence, the jury convicted Defendant of two counts of abuse of a child, § 568.060, for knowingly inflicting cruel and inhuman punishment on James and Jesse Floyd by excessively paddling both boys.

## DISCUSSION AND DECISION

■ Defendant's single point relied on in No. 20707 challenges the sufficiency of the evidence to support his conviction. In reviewing the sufficiency of the evidence to support a criminal conviction, we do not weigh the evidence but accept as true all evidence tending to prove guilt along with all reasonable inferences that support the decision of the jury. *State v. Simmons*, 955 S.W.2d 752, 764[23] (Mo.banc 1997) *cert. denied*, — U.S. —, 118 S.Ct. 1081, 140 L.Ed.2d 139 (1998). We ignore all contrary evidence and inferences. *Id.* Moreover, our "[r]eview is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *Id.* at 764–765[23].

■ We note that witness testimony comprised the majority of the evidence adduced at trial. Resolutions of conflicts in evidence and deciding witness credibility to determine if the defendant is guilty beyond a reasonable doubt is the role of the jury and not the function of the reviewing court. *State v. Gaver*, 944 S.W.2d 273, 277[2] (Mo.App.1997).

The crime of abuse of a child is defined in § 568.060.1(1) as follows:

"1. A person commits the crime of abuse of a child if he:

"(1) Knowingly inflicts cruel and inhuman punishment upon a child less than seventeen years old...."

Defendant's only point relied on has two prongs. Specifically, Defendant argues that the trial court erred in denying his motion for acquittal at the close of evidence "because the evidence was insufficient to prove that [Defendant] inflicted 'cruel and inhuman punishment' on James or Jesse ... in that (1) paddling a child's bottom with a wooden paddle may not be 'cruel and inhuman'; and in

that (2) there was no evidence that the paddling was part of any 'punishment.' "

In arguing the first prong of his point, Defendant insists that it is unclear whether his conduct, as demonstrated by the evidence in this case, is prohibited by § 568.060.1(1). In his argument, Defendant states:

> "Was the alleged paddling of James and Jesse in this case 'cruel and inhuman'? It may be that under the term's 'settled common-law meaning' it is always cruel and inhuman to strike any child. Or perhaps some physical punishment is not cruel and inhuman and some is. Maybe the line that separates punishment that is not cruel and inhuman from punishment that is cruel and inhuman is, as some cases suggest, when bruising occurs. Perhaps the method of punishment, the age of the child, and the part of the child's body to which the punishment was directed should also be considered.

> "In this case, the evidence was that [Defendant] used a wooden paddle on the bottoms of both James, who was eight years old, and Jesse, age ten. The spanking left large bruises on both boys. Perhaps this was sufficient to prove that it was cruel and inhuman. Or perhaps the meaning of the term 'cruel and inhuman' requires something more cruel and less human than a hard paddling."

Defendant argues that, because his conduct is not clearly prohibited by § 568.060.1(1), this court should construe the statute narrowly and hold that his conduct was not criminal. *See State v. Ide*, 933 S.W.2d 849, 851 (Mo.App.1996)(holding that a criminal statute must be strictly construed against state). Continuing, Defendant asserts that if the conduct demonstrated by the evidence is not prohibited by § 568.060.1(1), then, logically, the evidence must be insufficient to sustain his conviction under the statute.

In large measure, Defendant's argument is merely a disguised attack on the language of the statute as being vague and indefinite. To the extent his argument is grounded on that theory, it has no merit. In

*State v. Brown*, 660 S.W.2d 694 (Mo.banc 1983), the defendant argued that the language now contained in § 568.060.1(1) was unconstitutionally vague under the 14th Amendment to the United States Constitution.[3] In rejecting the defendant's claim, our supreme court declared "[t]he words 'cruel and inhuman punishment' in the statute are not so vague and indefinite as to render the statute void for vagueness. These terms have a settled common-law meaning and are words of general and common usage about which there is no great dispute as to meaning." *Id.* at 698[4].

It is true that appellate courts strictly construe criminal statutes against the state and resolve any ambiguities in favor of the defendant in a criminal case, but this rule of strict construction does not require a reviewing court to dispense with common sense or to ignore an evident statutory purpose. *State v. Knapp*, 843 S.W.2d 345, 347[3] (Mo. banc 1992); *State v. Hobokin*, 768 S.W.2d 76, 77[1] (Mo.banc 1989). Here, when viewed in the light most favorable to the State, the evidence demonstrates that Defendant swung a wooden paddle like a "[b]all bat" and struck his stepson Jesse Floyd on his buttocks, back, and legs numerous times, causing severe bruising. Likewise, Defendant swung a wooden paddle like a "[b]all bat" and struck his stepson James Floyd's bare buttocks "[a]s hard as he could" numerous times, again causing severe bruising. Both boys' bruises persisted for a number of days. The examining physician concluded that the bruises were "consistent with child abuse."

Without question, some people believe that spanking is an acceptable form of disciplining children. *See State v. Lauer*, 955 S.W.2d 23, 26 (Mo.App.1997). Nevertheless, it would defy the conscience and common sense to conclude that it is not "cruel and inhuman" to beat two children, ages eight and ten, in such a manner as to leave numerous severe bruises on both children as described in the record before us. *Id.* To conclude that the evidence outlined above does not support a jury finding that Defendant's conduct was

---

**3.** The statutory provision at issue in *Brown* was § 568.060.1(a), RSMo 1978, which is identical to § 568.060.1(1), RSMo 1994.

"cruel and inhuman" would, likewise, defy the law. *Id.* Direct evidence that Defendant repeatedly struck these children with a three-foot-long, one-inch-thick board with enough force to cause severe bruises is sufficient substantial evidence for a reasonable juror to conclude that Defendant's actions were "cruel and inhuman." *Id.* (citing *State v. Sumowski,* 794 S.W.2d 643, 646 (Mo.banc 1990)). Accordingly, we conclude that the evidence in this record overwhelmingly supports the jury's finding that Defendant's conduct toward these two children was "cruel and inhuman."

■ In the second prong of his point relied on, Defendant challenges the sufficiency of the evidence to prove that his paddling of James and Jesse was "punishment." When construing a statute, appellate courts ascribe to words their plain and ordinary meaning. *State v. Perry,* 954 S.W.2d 554, 568[27] (Mo.App.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 2062, 141 L.Ed.2d 139 (1998). For our purposes, a word's plain and ordinary meaning is its dictionary definition. *Id.* In his brief, Defendant sets out a number of definitions of the term "punishment," including two which define the term as "severe, rough, or disastrous treatment," WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1984), and "rough handling," WEBSTER'S NEW WORLD DICTIONARY (1964). Defendant suggests that these definitions are uncommon and urges us to look only to the "most commonly used" definition, which he contends would require "that punishment be imposed on an 'offender' as 'retribution' or a 'penalty' for some wrongdoing." Defendant argues that, because there was no evidence introduced at trial indicating that Defendant's actions constituted "punishment" as the term is "commonly used," the evidence is insufficient to sustain his conviction.

■ We disagree with Defendant's argument in several respects. We have found definitions of "punishment" similar to the "uncommon" ones cited above in numerous dictionaries. *See, e.g.,* FUNK & WAGNALL'S STANDARD DICTIONARY (1980) (*"Informal.* Rough handling"); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1973) (*"Informal.* Rough handling; mistreat-

ment"). We surmise, therefore, that this definition is much more common than Defendant would have us believe. Furthermore, we find that these definitions are consistent with the legislature's intent and purpose for § 568.060. When construing a statute, our ultimate purpose is to ascertain and give effect to the legislature's intent in enacting the statute. *State v. Haskins,* 950 S.W.2d 613, 618[13] (Mo.App.1997).

■ Moreover, we presume that the legislature did not intend an unreasonable or absurd result. *State v. Moore,* 952 S.W.2d 812, 813 (Mo.App.1997). If we ascribe to the term "punishment" the meaning asserted by Defendant, then only those persons who would inflict cruel and inhuman treatment on children for some retributive purpose would be acting in violation of the statute. Those persons who would inflict cruel and inhuman treatment on children for any reason other than retribution, however arbitrary or malicious, would be acting within the law insofar as § 568.060 is concerned. We find such an interpretation absurd, unreasonable, unacceptable, and the argument itself frivolous. We hold that the plain and ordinary meaning of the term "punishment," as used in § 568.060, includes "severe, rough, or disastrous treatment." *See* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1984); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1976).

■ The same evidence that supports the jury's finding that the Defendant's conduct was "cruel and inhuman" also sufficiently supports the jury's finding that Defendant's conduct was "punishment" as we have defined it. Consequently, we deny Defendant's point relied on, and we affirm his conviction and sentence in No. 20707.

■ Although Defendant also filed a notice of appeal in case No. 22025, in which the motion court denied his motion for post-conviction relief, Defendant's brief contains neither a point relied on nor an argument assigning error to the motion court's judgment in that case. Consequently, we hold that Defendant has abandoned, for purposes of appeal, the issues raised in his motion for post-conviction relief. *See State v. Johnson,*

937 S.W.2d 237, 240 (Mo.App.1996); *State v. Kendus,* 904 S.W.2d 41, 44[6] (Mo.App.1995).

We affirm the judgment of conviction and sentence in No. 20707 and dismiss Defendant's appeal from the judgment in No. 22025.

MONTGOMERY, J., and GARRISON, C.J., concur.