**STATE of Missouri, Plaintiff–Respondent,**

v.

**Dustin R. STILL, Defendant–Appellant.**

No. 27254.

Missouri Court of Appeals, Southern District, Division Two.

March 16, 2007.

Nancy A. McKerrow, Columbia, MO, for defendant–appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Dora A. Fichter, Asst. Atty. Gen., Jefferson City, MO, for plaintiff–respondent.

JEFFREY W. BATES, Chief Judge.

Dustin R. Still (Defendant) was charged by amended information with two counts of committing the class C felony of abuse of a child by beating A.B. and N.B. *See* § 568.060.[1] A jury found Defendant guilty of each count, but no sentencing recommendations were made because Defendant was a prior and persistent offender. *See* § 557.036.4(2) RSMo Cum.Supp. (2004). The trial court sentenced Defendant to a term of 5 years imprisonment for each count and ordered the sentences to run concurrently.[2]

On appeal, Defendant presents two points for decision. First, he contends the trial court erred in overruling Defendant's motion for judgment of acquittal at the close of all of the evidence because there was insufficient proof that he knowingly inflicted cruel and inhuman punishment on A.B. and N.B. Second, Defendant contends the trial court committed plain error when it admitted testimony concerning prior uncharged misconduct by Defendant. We affirm.

### Point I—Sufficiency of the Evidence

■ Defendant's first point challenges the sufficiency of the evidence to support his conviction. It is not our function to resolve conflicts in the evidence and decide the credibility of witnesses to determine whether the defendant is guilty beyond a reasonable doubt; in the case at bar, that role belonged to the jury. *State v. Silvey*, 980 S.W.2d 103, 106 (Mo.App.1998). Our review "is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Simmons*, 955 S.W.2d 752, 764–65 (Mo. banc 1997); *see State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005).

■ Insofar as relevant here, a person commits the crime of child abuse if he "[k]nowingly inflicts cruel and inhuman punishment upon a child less than seventeen years old[.]" § 568.060.1(1). In the amended information, Count I alleged that, on or about March 29, 2004, Defendant "knowingly inflicted cruel and inhuman punishment upon [A.B.], a child less than seventeen years old, by beating said child with a board and with his hand." Count II alleged that, on the same date, Defendant abused N.B. in the same manner as A.B. In deciding whether the evidence was sufficient to convict Defendant of child abuse, "the appellate court must consider the evidence, together with all reasonable inferences drawn therefrom, in the light most favorable to the verdict and disregard all evidence and inferences to the contrary." *State v. Sumowski*, 794 S.W.2d 643, 645 (Mo. banc 1990). Viewed in that light, the following facts were adduced at trial.

In March 2004, Defendant lived with Cheena Tinsley (Tinsley) and three children. A.B., then almost four years old,

---

1. All references to statutes are to RSMo (2000) unless otherwise specified. All references to rules are the Missouri Court Rules (2006).

2. The authorized punishment for a class C felony is a term not to exceed seven years. § 558.011.1(3) RSMo Cum.Supp. (2004). Because Defendant was a persistent offender, however, he received the minimum allowable sentence for a class B felony. §§ 558.016.7(3), 558.011.1(2) RSMo Cum.Supp. (2004).

and N.B., then almost three years old, were Tinsley's children from a prior relationship. Heaven, who was 16 months old, was the daughter of Defendant and Tinsley. There was a paddle hanging on the wall of the kitchen in Tinsley's home. She had placed the paddle there as a wall decoration because she liked the humorous saying printed on it: "For managing monsters, controlling cowboys, and walloping wolves. Board of corrections may be used on any child from five to seventy five." Tinsley had never used the paddle to spank her sons and did not plan to do so because it would be too painful.

Tinsley worked at a McDonald's restaurant in Webb City, Missouri. She and Defendant had no car, so Tinsley rode to work with her sister, Tanya Denham (Denham). Before going to work, Tinsley and Denham would take all three children to a daycare center about 15 minutes away by car.

On Monday, March 29th, Tinsley was supposed to be at work by noon. Because Denham arrived late, Tinsley left the three children in Defendant's care. When Tinsley came home from work, she found a note from Defendant saying that the children were with Tracy Aston (Aston), Defendant's former girlfriend. Tinsely picked up the children from Aston's house and returned home. Later that night at bath time, Tinsley noticed that both of her sons' buttocks "were red, with like spots of blue." When Defendant arrived home, Tinsley confronted him about the bruises. Initially, Defendant said the boys "were rough housing and they had their toys all over the place and they could have fell on their toys." Later, he admitted spanking A.B. and N.B. once with his hand and said that he was sorry if he left bruises.

On Tuesday, March 30th, Tinsley did not take the boys to daycare. She was afraid the Children's Division would take her children away if the daycare provider, Beverly Lyn Brock (Brock), discovered the bruises and reported them. Tinsley told Defendant that he would have to watch the boys until the bruises were gone.

As it turned out, Defendant had a job interview on Wednesday, March 31st. Since he was not able to watch A.B. and N.B., Tinsley took the boys to daycare anyway. She told Brock that one of the boys had bruises on his bottom, but Tinsley had already taken care of the problem. Brock did not see any bruises on A.B. or N.B. that day because she did not have any occasion to help them in the bathroom or change their clothes.

On Thursday, April 1st, Brock was helping A.B. in the bathroom when she saw bruising on his buttocks. The bruises were so severe that Brock almost "threw up." She then checked N.B. and observed similar bruising on his buttocks. Brock was not able to reach a live operator on the Children's Division hotline, so she called the Joplin Police Department. Detective Michael Gaymon (Detective Gaymon) and a Children's Division investigator, Nova Probst (Probst), went to McDonald's and told Tinsley that she needed to pick up A.B. and N.B. immediately and take them to the Children's Center. Once there, the children were examined by Probst and nurse practitioner Leigh Rodriguez (Rodriguez). They found severe bruising on the boys' buttocks caused by a linear object. One of the boys also had a mark from a hand on his buttocks. The bruises were consistent with physical abuse. The injuries on the boys' buttocks were measured and photographed. The dimensions of the bruises were consistent with a decorated paddle Probst later found hanging on the wall of Tinsley's

kitchen.[3]

Defendant was interviewed by Detective Gaymon on Thursday afternoon. Defendant said that he had been babysitting A.B., N.B. and Heaven that day. While Heaven was asleep on the couch, the boys were fighting in their room. According to Defendant, A.B. was throwing things at N.B., so Defendant picked up a decorated paddle hanging on the kitchen wall and "busted both their butts." The boys continued to misbehave, so Defendant went in their room two more times to hit them with the paddle. Defendant told Detective Gaymon that he hit the boys a total of four or five times with the paddle on the three separate occasions and that he hit them once with his hand. Defendant admitted that "he had spanked [A.B. and N.B.] too hard with the paddle and with his hands." Defendant admitted this was wrong and he should not have done it. Defendant knew that the bruises on the boys' buttocks had been caused by spanking them too hard and that he probably hit the boys hard enough to leave board prints and fingerprints on their buttocks.

■ At the close of all of the evidence, Defendant filed a motion for judgment of acquittal. The trial court denied the motion. On appeal, Defendant contends this ruling was erroneous because the evidence was insufficient to support the jury's finding that: (1) Defendant inflicted cruel and inhuman punishment; and that (2) he did so knowingly.[4] Neither contention has merit.

■ In the case at bar, Defendant admitted that he hit A.B. and N.B. once with his hand and four or five times with a paddle. Tinsley had never spanked her sons with that paddle because it would hurt them too much. Defendant further admitted that he had spanked the boys "too hard" and that he should not have done it because it was wrong.[5] At that time, A.B. was under four years of age and N.B. was under three years of age. The beating administered by Defendant left a hand print on one boy, as well as paddle prints and visible bruises on both boys. When daycare provider Brock saw A.B.'s bruise, she nearly "threw up." That same day, Probst and Rodriguez observed and photographed severe bruising on each boy. These photographs, which were introduced in evidence, show that A.B. had a very

3. At trial, the paddle that Defendant used to hit A.B. and N.B. was admitted in evidence as *State's Exhibit 1*. The trial court also admitted Exhibits 2–7, 9 and 10, which were photographs of the boys. Exhibits 3–5, 7 and 9 showed that A.B. had a very visible bruise approximately five inches by four inches on his buttocks and that N.B. had a very visible bruise approximately four inches by three inches on his buttocks.

4. Defendant also filed a motion for judgment of acquittal at the close of the State's evidence, which was overruled. Thereafter, Defendant presented evidence on his own behalf. By doing so, Defendant waived any claim of error relating to the court's ruling on the first motion for judgment of acquittal. *See State v. Glowczewski*, 168 S.W.3d 100, 102 (Mo.App. 2005); *State v. Meuir*, 138 S.W.3d 137, 143 (Mo.App.2004).

5. During the interview with Detective Gaymon, Defendant said he spanked the boys too hard "[b]ecause I don't know my own strength, because a lot of people tell me even when I bust a kid with my hand it's a little too hard.... I don't honestly know how hard I'm hitting." Without any citation to supporting authority, Defendant argues that we must consider these statements in determining the sufficiency of the evidence to support his conviction. That is incorrect. The State was not bound by these self-serving statements even though they were introduced during Detective Gaymon's testimony, and the jurors were free to disregard them. *State v. Caldwell*, 434 S.W.2d 571, 575 (Mo.1968); *State v. Holman*, 556 S.W.2d 499, 508 (Mo.App.1977). Therefore, as required by our standard of review, we too have disregarded these statements in addressing Defendant's first point.

visible bruise approximately five inches by four inches on his buttocks. N.B. had a very visible bruise approximately four inches by three inches on his buttocks. Based upon this evidence, a reasonable juror could have found beyond a reasonable doubt that Defendant inflicted cruel and inhuman punishment on A.B. and N.B. *See State v. Sumowski*, 794 S.W.2d 643, 645 (Mo. banc 1990); *State v. Lauer*, 955 S.W.2d 23, 26 (Mo.App.1997); *State v. Silvey*, 980 S.W.2d 103, 106 (Mo.App.1998).

In *Sumowski*, the defendant disciplined his six-year-old stepson by slapping the child several times. These blows caused bruises on the child's face and neck which were still visible two days later. *Sumowski*, 794 S.W.2d at 645–46. After Defendant was convicted of abuse of a child in violation of § 568.060 RSMo (1986), he challenged the sufficiency of the evidence to sustain his conviction. Our Supreme Court affirmed the defendant's conviction because "[t]he direct and circumstantial evidence that defendant struck [the child] in the face with sufficient force to cause bruises which would be visible two days later" was sufficient to prove that he knowingly inflicted cruel and inhuman punishment on a child. *Id.* at 646.

In *Lauer*, multiple bruises were found on the buttocks, anterior and posterior thighs, and lower back of a two-year-old child. The defendant admitted that he had used his hand to spank the child and that he had been "too rough" on the child. *Lauer*, 955 S.W.2d at 26. We held that there was sufficient evidence of cruel and inhuman punishment to support the defendant's conviction for abuse of a child in violation of § 568.060 RSMo (1994):

> Certainly, many people might agree that spanking is an acceptable form of disciplining children. Yet, it would defy the conscience to find that beating a two-year-old child in such a manner as to leave the type and number of bruises described in the record does not constitute cruel and inhuman punishment. A finding that this beating does not constitute cruel and inhuman punishment would also defy the law. Direct evidence that Defendant struck M___ with enough force to cause these bruises is sufficient to support the trial court's finding that this beating constituted cruel and inhuman punishment.

*Id.*

In *Silvey*, the defendant struck his two stepsons with the wooden board numerous times on their buttocks, back, legs and arms with enough force to cause severe bruising that persisted for a number of days. Relying on *Lauer*, the *Silvey* court concluded there was substantial evidence for a reasonable juror to conclude that the defendant's actions were "cruel and inhuman." *Silvey*, 980 S.W.2d at 108.

Defendant attempts to distinguish these cases because the bruising here was not as extensive as that described in *Sumowski*, *Lauer* and *Silvey*. His effort is unavailing for two reasons. First, Defendant misapprehends the import of these opinions. In each, the punishment was adjudged to be cruel and inhuman because the child was struck with sufficient force and violence so as to leave severe bruises. *See Sumowski*, 794 S.W.2d at 645–46; *Lauer*, 955 S.W.2d at 26; *Silvey*, 980 S.W.2d at 108. The discussion in each case concerning the extent of the victim's bruising helped illustrate and explain why excessive force had been used on the child. That principle applies here as well. Second, the bruising Defendant caused to A.B. and N.B. does not appear to be any less severe than that inflicted by the defendant in *Sumowski*, which was adjudged sufficient to prove cruel and inhuman punishment.

Defendant also seeks to distinguish these cases by arguing that they involved

patterns of abuse, while the case at bar involves only a single episode. This argument is spurious because § 568.060 does not require proof of a pattern of abuse before a defendant can be convicted. For example, in both *Sumowski* and *Lauer*, the defendants were convicted of abuse of a child based on a single incident of spanking a child in a cruel and inhuman fashion. *See Sumowski*, 794 S.W.2d at 645–46; *Lauer*, 955 S.W.2d at 26.

In the case at bar, the State presented evidence that Defendant used a wooden paddle and his hand to beat A.B. and N.B. with sufficient force to cause severe bruising on their buttocks that was visible two days later. There was sufficient evidence from which a reasonable juror could have found, beyond a reasonable doubt, that Defendant inflicted cruel and inhuman punishment on A.B. and N.B. Defendant's first argument has no merit.

▆▆▆ Defendant also contends that there was insufficient evidence to prove that he acted knowingly. We disagree. It is axiomatic that direct proof of a defendant's intent is rarely available. *State v. Yole*, 136 S.W.3d 175, 182 (Mo.App.2004). For this reason, intent may be established by circumstantial evidence. *State v. Durant*, 156 S.W.3d 524, 527 (Mo.App.2005). The trier-of-fact also is permitted to infer a defendant's intent from the surrounding facts or from the act itself. *State v. Heyn*, 175 S.W.3d 173, 177 (Mo.App.2005); *Durant*, 156 S.W.3d at 527.

▆▆▆ A person acts knowingly "when he is aware that his conduct is practically certain to cause the result." § 562.016.3(2). During the interview with Detective Gaymon, Defendant admitted that: (1) he hit the boys "too hard" with the paddle and with his hand; (2) he should not have done it; and (3) he knew what he did was wrong. "The admissions of a criminal defendant are direct evidence of his guilt."

*State v. Sumowski*, 794 S.W.2d 643, 646 (Mo. banc 1990). Moreover, Defendant attempted to conceal what he had done by first telling Tinsley that the boys fell on their toys. Defendant then attempted to mislead Tinsley about what had happened by saying that he had only spanked the boys with his hand. "A permissible inference of guilt may be drawn from acts or conduct of an accused subsequent to an offense if they tend to show a consciousness of guilt by reason of a desire to conceal the offense or role therein." *State v. Schwartz*, 899 S.W.2d 140, 144 (Mo.App. 1995); *see State v. Fitzgerald*, 778 S.W.2d 689, 691 (Mo.App.1989) (defendant's inconsistent versions of how the child's injuries occurred and statement that "demons" caused the cuts tended to show a consciousness of guilt by reason of defendant's desire to conceal the offense and her role therein). Finally, Defendant's intent could be inferred from his actions. Defendant intentionally beat A.B. and N.B., who were very young children, by striking them with a wooden paddle four or five times and with his hand once. The blows were inflicted with sufficient force to leave marks on the skin and cause severe bruising on the boys' buttocks. The paddle that Defendant used to beat the boys was admitted in evidence, along with photographs of the injuries he inflicted. The jurors were able to evaluate these exhibits and consider them in conjunction with the evidence of Defendant's admissions and his initial attempts at deception. There was sufficient evidence from which a reasonable juror could have found, beyond a reasonable doubt, that Defendant acted knowingly. Defendant's second argument has no merit.

Because there was sufficient evidence from which a reasonable juror could have found, beyond a reasonable doubt, that Defendant knowingly inflicted cruel and

inhuman punishment on A.B. and N.B., the trial court did not err in overruling Defendant's motion for acquittal at the close of all of the evidence. Therefore, Point I is denied.

### Point II—Prior Uncharged Misconduct

■ In Defendant's second point, he contends the trial court erred by allowing the State to elicit testimony during Tinsley's direct examination that, approximately two years earlier, "[t]here was one incident where [Defendant] held a knife to my throat and told me that he would kill me and take off with my kids if I did not have anal sex with him." Defendant argues that this testimony should have been excluded because it disclosed prior uncharged misconduct involving Defendant. Since this objection was not raised at trial, Defendant seeks plain error review pursuant to Rule 30.20. Before addressing Defendant's contention, however, certain additional facts must be related.

During Tinsley's cross-examination, defense counsel brought out the fact that: (1) Tinsley was the primary disciplinarian of the children and had spanked A.B. and N.B. on prior occasions; and (2) when Detective Gaymon and investigator Probst came to question Tinsley, she did not immediately cooperate with them. After Defendant had raised the issue of Tinsley's reluctance to cooperate, the prosecutor addressed that subject during Probst's direct examination:

Q The testimony today that was induced [sic] by the defense suggested that [Tinsley] was less than cooperative with you and Detective Gaymon when you first contacted her at her place of employment. Would that be true?

A Yes.

Q Did that surprise you at all?

A No.

Q Did it concern you?

A Yes.

Q Why did it not surprise you?

A Women in domestic violence situations tend to act that way against the perpetrator, the alleged perpetrator, for their protection.

The foregoing testimony was elicited without objection from Defendant. When the prosecutor asked Probst to explain why women act that way, Defendant raised only a general objection to the question. The trial court overruled the objection because Defendant had opened the door to this line of inquiry by cross-examining Tinsley about not cooperating with the police. After the objection was overruled, Probst testified that she was not surprised by Tinsley's reaction because Probst was already aware of the prior knife incident involving Defendant and Tinsley, and "she was trying to protect herself from a domestic violence situation[.]" On cross-examination, Defendant adduced testimony from Probst that Tinsley had been reluctant to talk and that there were times when she did "swat the boys." During Detective Gaymon's cross-examination, he was asked about his interview with Defendant. The detective acknowledged that Defendant had said Tinsley spanked the boys on Sunday before Defendant did so on Monday. Defense counsel then brought out the fact that Detective Gaymon did not question Tinsley about this or even consider her as a suspect. Thereafter, Detective Gaymon testified that, when he first contacted Tinsley, "[s]he seemed scared."

The purpose behind defense counsel's questioning of Tinsley, Probst and Detective Gaymon about the nature of Tinsley's cooperation with the investigation became self-evident during closing arguments. The prosecutor focused on Defendant's ad-

missions and the physical evidence of abuse.[6] In Defendant's closing argument, counsel responded by suggesting that Tinsley may have been the person who actually injured A.B. and N.B.:

> Now, [Tinsley] was reluctant to cooperate with the detective. Not because she was in an abusive situation, because it wasn't going on then. It wasn't happening. But because she was afraid that she was going to get her kids taken away from her if it was found that she had an [sic] knowledge or any part in this at all.... There were other individuals between the Sunday, the 28th, and Thursday, that had access to these children besides [Defendant]. [Defendant] was zeroed in on by the police from the get-go. And Detective Gaymon didn't want to admit that. They didn't look at anybody else. They zeroed right in on [Defendant]. They didn't look to see if maybe [Tinsley] paddled them, whether there was anybody that had any input into it besides [Tinsley]. And [Tinsley] definitely had a stake in it. She didn't want to lose her kids.

■■■■ With that factual summary completed, we now address Defendant's argument that the trial court committed plain error in allowing the State to elicit testimony from Tinsley concerning the prior knife incident involving Defendant. Rule 30.20 provides that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Preliminarily, it is important to point out that the outcome of plain error review depends heavily on the particular facts and circumstances of each case. *State v. Roper*, 136 S.W.3d 891, 900 (Mo.

App.2004); *State v. Ficke*, 892 S.W.2d 814, 817 (Mo.App.1995). "Plain error review is used sparingly and is limited to those cases where there is a clear demonstration of manifest injustice or miscarriage of justice." *State v. Smith*, 185 S.W.3d 747, 757 (Mo.App.2006). The burden of proving the existence of such manifest injustice or a miscarriage of justice rests on Defendant. *State v. Stanley*, 124 S.W.3d 70, 77 (Mo. App.2004). The State argues that relief under the plain error rule should be denied because Defendant has failed to meet that burden. We agree.

■■■■ Defendant contends he is entitled to plain error relief because of the trial court's admission of Tinsley's testimony concerning prior misconduct by Defendant. In order for Defendant to clearly demonstrate that a manifest injustice or miscarriage of justice has occurred, he must prove the admission of Tinsley's testimony was outcome-determinative. *State v. Mickle*, 164 S.W.3d 33, 59 (Mo.App.2005). As our Supreme Court explained in *State v. Barriner*, 34 S.W.3d 139 (Mo. banc 2000):

> There is a distinction between evidence-specific and outcome-determinative prejudice. When the prejudice resulting from the improper admission of evidence is only evidence-specific and the evidence of guilt is otherwise overwhelming, reversal is not required. In contrast, when the prejudice resulting from the improper admission of evidence is outcome-determinative, reversal is required. A finding of outcome-determinative prejudice "expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced

---

6. The prior incident involving Defendant and Tinsley was never mentioned by the State during either portion of its closing argument.

against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence."

*Id.* at 150 (internal citations omitted). Put more simply, Defendant is not entitled to relief under the plain error rule unless it is reasonably probable that the jurors would have reached a different conclusion if Tinsley's testimony about the prior incident had been excluded. Based on the record before us, Defendant has failed to make the requisite showing for three reasons.

First, the admission of Tinsley's testimony concerning Defendant's prior misconduct is harmless if other properly admitted evidence rendered her testimony cumulative. *See State v. Pruitt,* 756 S.W.2d 201, 203 (Mo.App.1988); *State v. Burnside,* 527 S.W.2d 22, 25 (Mo.App.1975). During Probst's testimony, she discussed the very same knife incident that was disclosed during Tinsley's testimony. Probst also opined that Tinsley had been the victim of prior domestic violence and that, by being reticent about the abuse of her children, she was simply trying to protect herself. Defendant has not challenged the admission of Probst's testimony on appeal. Therefore, even if Tinsley's testimony was erroneously admitted, the error was harmless because it was cumulative of like evidence adduced from Probst.

Second, it was Defendant who made Tinsley's cooperation with the police and the Children's Division an issue in the case. This subject was first broached during Tinsley's cross-examination, and the same line of inquiry was continued with Probst and Detective Gaymon. Once the issue was raised, the State had the right to introduce evidence of prior uncharged misconduct by Defendant against Tinsley in order to show that her lack of cooperation was attributable to her fear of Defendant. *See State v. Leitner,* 945 S.W.2d 565, 574–75 (Mo.App.1997); *State v. Ficke,* 892 S.W.2d 814, 817 (Mo.App.1995); *State v. Coutee,* 879 S.W.2d 762, 768 (Mo.App. 1994). Such evidence was supplied via the testimony of Probst and Detective Gaymon that: (1) before Tinsley was interviewed, Probst had already become aware of the prior knife incident involving Tinsley and Defendant; (2) that made Tinsley a victim of prior domestic violence; (3) she seemed scared when first contacted by the police and the Children's Division; and (4) by not cooperating, Tinsley was trying to protect herself from further domestic violence.

Third, the erroneous admission of evidence concerning a defendant's prior misconduct or uncharged crimes does not require reversal if the evidence of guilt is strong. *State v. Roper,* 136 S.W.3d 891, 903–04 (Mo.App.2004); *State v. Enke,* 891 S.W.2d 134, 139–40 (Mo.App.1994). In the case at bar, the jury was presented with admissions from Defendant that: (1) he hit the boys "too hard" with the paddle and with his hand; (2) he should not have done it; and (3) he knew what he did was wrong. There was also evidence concerning Defendant's attempts to conceal, and then minimize, what he had done. Defendant beat A.B. and N.B. with sufficient force to leave marks on their skin and cause severe bruising on each boy's buttocks. The jurors had the opportunity to see photographs of the boys' injuries and to examine the paddle that Defendant used. In the face of such strong and substantial evidence of guilt, we are unpersuaded that the admission of Tinsley's testimony about Defendant's prior misconduct resulted in a miscarriage of justice or manifest injustice. Accordingly, Point II is denied.

The judgment of the trial court is affirmed.

GARRISON, J., and LYNCH, J., Concurs.