**STATE of Missouri, Plaintiff–Respondent,**

v.

**Jibril Bin–Amir WALTON, Defendant–Appellant.**

**No. 26038.**

Missouri Court of Appeals, Southern District, Division Two.

June 23, 2005.

Ellen H. Flottman, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Adriane Dixon Crouse, Asst. Atty. Gen., Jefferson City, for Respondent.

JOHN E. PARRISH, Presiding Judge.

Jibril B. Walton (defendant) was convicted, following a jury trial, of involuntary manslaughter in the first degree (Count I), § 565.024.1(1), and armed criminal action (Count II), § 571.015.1.[1] He was charged as, found to be, and sentenced as a persistent offender. *See* § 558.016. This court affirms the judgment of conviction in Counts I and II and the sentence in Count I. The sentence in Count II is reversed and the case remanded for resentencing as to the offense of armed criminal action in conformity with the opinion that follows.

The charge of involuntary manslaughter in the first degree of which defendant was convicted was a lesser-included offense of second-degree murder. Defendant was found guilty of having recklessly caused the death of Billy Junior Jones (victim) on August 18, 2002, in Cape Girardeau County, Missouri. The case was tried in Butler County after change of venue.

Defendant had a confrontation in March 2002 with victim's cousin, Dennis Williams, and Williams' friend, Jimmy Walker. Defendant was in an apartment when Williams and Walker kicked in the apartment door. Defendant explained:

[Walker] put a .44 magnum to my head and makes me get on my knees and I got on my knees and I'm trying to talk to him, but then he is getting agitated so I just got quiet and he told me to reach, give, get my money. . . . So I reached to get my money and it was in my wallet and I was reaching in my pocket and he said, "Quit moving so fast," which I wasn't and he was shaking and I thought he was going to shoot me and, huh, I finally got my wallet put on the table and then [Williams] comes out the room and says, "That's not him, that's the wrong person." And, huh, they leave and, huh, I wait—

Defendant did not report the incident to the police. He explained Williams and Walker threatened to kill him and his girlfriend if he reported the incident to the police.

In the early morning hours on August 18, 2002, defendant confronted Williams and tried to fight him. Defendant told the court and jury that Williams backed away; that victim stepped between them and said no one was going to jump his cousin. The police arrived and told everyone to leave. Defendant left and went to a hangout on Jefferson Street. Dartanyus Harris, a friend of victim, was there. Victim and Williams arrived a short time later. Defendant argued with Harris, victim, and Williams, then everyone left. Harris got in victim's car and rode around. Defendant went home.

Later that morning, defendant left his house and picked up some friends. Defendant took a gun with him. They went to Indian Park in Cape Girardeau to a basketball tournament. Defendant stayed at the park for a while. Defendant's friends took his car. Later, they returned and picked him up.

Defendant saw victim and Williams in a car. He was driving behind them. Defendant told the court and jury:

---

1. References to statutes are to RSMo 2000 unless stated otherwise.

I was flagging them, you know, it was, it started drizzling not too long after that, I hit the lights and kept flicking the lights and they didn't pull over. I honked the horn and they didn't pull over and I pulled into a gas station ... and I hit the lights and at the stop sign I'm parked like this and they are like this and hit the lights and they still didn't pull over.

Defendant continued following the car. He passed them, then decided he could not make them stop; that he would talk to them another time. Defendant drove toward his home. The other car passed him. After the car passed, defendant saw it park. Defendant put his gun on his lap, then parked his car near the other car.

Defendant testified that after attempts at conversation with the people in the other car, Harris reached in the floorboard. Defendant fired his weapon "five or six" times as Harris was "coming up." Defendant "sped off." Defendant handed the gun to his passenger. The passenger threw the gun out of the car into a sewer drain. Defendant went home. Later, at a friend's house, defendant took shell casings that had been ejected inside his car and threw them in a trash dumpster. Victim was wounded when defendant fired into the car. Harris drove him to a hospital. Victim was pronounced dead 12 hours after arriving at the hospital.

Dr. Russell Deidiker, a pathologist at Mineral Area Hospital in Farmington, Missouri, performed an autopsy on victim. He found three gunshot wounds to victim. One to the mid-back, one "to the right of the back of the left shoulder," and one "below the back of the left arm." Dr. Deidiker testified that victim "died of gunshot wound to the chest."

Defendant moved for acquittal at the close of the state's evidence and at the close of all evidence. The motions were overruled. Following trial, defendant filed a "Motion for Judgment of Acquittal or, in the Alternative, for a New Trial." It included allegations that the trial court erred in overruling defendant's motions for acquittal at the close of the state's evidence and at the close of all evidence. The motion was denied.

Defendant's first point on appeal asserts the trial court erred in denying the motions for acquittal and in entering judgment on the verdict of guilty of armed criminal action "in that the mental state of recklessness does not support a charge of armed criminal action." Defendant argues that the offense of armed criminal action requires a mental state of either purposeful or knowing conduct; that a finding that defendant recklessly shot victim does not satisfy that requirement.

■ This issue was resolved contrary to defendant's claim of error in *State v. Belton*, 153 S.W.3d 307, 310 (Mo. banc 2005). *Belton* held:

Because section 571.015 [RSMo 1994] specifically provides that it is applicable to "any felony" committed with a deadly weapon, the culpable mental state of the underlying felony is irrelevant. This conclusion is consistent with section 562.026(2), RSMo Supp.1999, which provides that no culpable mental state is to be imputed to an offense if imputation is clearly inconsistent with the purpose of the statute defining the offense or may lead to an absurd or unjust result. As a result, the culpable mental state of purposely or knowingly as imputed to armed criminal action applies only to the use of the weapon and not to the under-

lying felony.[2]

*Id.* at 310. Point I is denied.

■ Point II alleges instructional error. Defendant argues that "[t]he trial court erred in including 'initial aggressor' language in Instruction Number 5, the Use of Force in Self–Defense instruction over defense counsel's objection" because "there was no evidence to support that [defendant] was the initial aggressor and the instruction therefore misled the jury."

Instruction No. 5 is patterned after MAI–CR3d 306.06. The instruction, as given by the trial court, states:

One of the issues in this case is whether the use of force by the defendant against [victim] was in self-defense. In this state the use of force including the use of deadly force to protect oneself from harm is lawful in certain situations.

*A person can lawfully use force to protect himself against an unlawful attack. However, an initial aggressor, that is, one who first attacks another, is not justified in using force to protect himself from the counter-attack that he provoked.*

In order for a person to use force in self-defense he must reasonably believe he is in imminent danger of harm from the other person. He need not be in actual danger. If he has such a belief, he is then permitted to use that amount of force that he reasonably believes to be necessary to protect himself.

But a person is not permitted to use deadly force, that is, force that he knows will create a substantial risk of causing death or serious physical injury, unless he reasonably believes he is in imminent danger of death or serious physical injury. And even then, a person may use deadly force only if he reasonably believes the use of such force is necessary to protect himself.

As used in this instruction, the term "reasonable belief" means a belief based on reasonable grounds, that is, grounds that could lead a reasonable person in the same situation to the same belief. This depends upon how the facts reasonably appeared. It does not depend upon whether the belief turned out to be true or false.

On the issue of self-defense in this case, you are instructed as follows:

*If the defendant was not the initial aggressor in the encounter with [victim] and/or Dartanyus C. Harris, and if the defendant reasonably believed that he was in imminent danger of death or serious physical injury from the acts of [victim] and/or Dartanyus C. Harris and he reasonably believed that the use of deadly force was necessary to defend himself, then he acted in lawful self-defense.*

The state has the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. Unless you find beyond a reasonable doubt that the defendant did not act in lawful self-defense, you must find the defendant not guilty.

As used in this instruction, the term "serious physical injury" means physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body.

Evidence has been introduced that [victim] and Dartanyus C. Harris had reputations for being armed and violent, and that the defendant was aware of

**2.** § 571.015, RSMo 1994, and § 562.026(2), RSMo Supp.1999, were unchanged in the 2000 revision of the statutes.

those reputations. You must consider this evidence in determining whether the defendant reasonably believed he was in imminent danger of harm from [victim] and/or Dartanyus C. Harris.

*Evidence has been introduced of the prior relationship between defendant and [victim], and the prior relationship between defendant and Dartanyus C. Harris, including evidence of arguments. You may consider this evidence in determining who was the initial aggressor in the encounter and you may also consider it in determining whether the defendant reasonably believed he was in imminent danger of harm from [victim] and/or Dartanyus C. Harris.*

If any threats against defendant were made by [victim] and/or Dartanyus C. Harris and were known by or had been communicated to the defendant, you may consider this evidence in determining whether the defendant reasonably believed he was in imminent danger of harm from [victim] and/or Dartanyus C. Harris.

You, however, should consider all of the evidence in the case in determining whether the defendant acted in lawful self-defense.

(Emphasis added.)

■ The italicized language in Instruction No. 5 is the "initial aggressor language" that is the subject of defendant's Point II. Notes on Use 4(a), 5(a), and 7 to MAI–CR3d 306.06 state that the "initial aggressor language" is to be used when there is evidence that a defendant was the initial aggressor. "An initial aggressor is one who first attacks or threatens to attack another." *State v. Hughes,* 84 S.W.3d 176, 179 (Mo.App.2002). The state need not present undisputed evidence that defendant was an initial aggressor in order to submit the issue to the jury. Conflicting evidence as to who was the initial aggressor presents an issue of fact for the jury to decide. *Id.*

There was evidence that defendant was angry about the armed robbery incident that occurred in March 2002 when victim's cousin attempted to rob defendant; that victim had been prepared to protect the cousin when the cousin was confronted by defendant. At the time of the shooting that resulted in victim's death, defendant placed a gun in his lap before driving alongside the car in which victim and his friends were sitting. Although defendant described victim's movement in the car which he found threatening, there was other evidence from which the jury could find defendant's expressed belief that he was in danger of attack was not reasonable; that, therefore, defendant was the aggressor in the incident that led to victim's death. Compare *State v. White,* 738 S.W.2d 590, 593 (Mo.App.1987). Conflicting evidence as to who was the initial aggressor presents a question of fact for the jury to decide. *Hughes,* 84 S.W.3d at 179. Point II is denied.

■ Defendant testified at trial. Point III is directed to questions the trial court permitted the prosecuting attorney to ask defendant on cross-examination. Defendant was asked about loaning his gun to a friend who used it to commit a robbery. Point III contends the trial court erred in overruling defendant's trial attorney's objection to questions concerning defendant's gun being loaned to someone else. Defendant argues that the questions by the prosecuting attorney created the impression defendant was a violent person; that this resulted in "inadmissible character and propensity evidence."

On direct examination, defendant's trial attorney asked defendant about owning a gun. Defendant said he purchased the gun for protection after the March 2002

robbery incident. Defendant purchased the gun in question in July 2002, "roughly a month before the shooting." Defendant said he purchased the gun "to have a way or protecting [him]self."

The following questions were asked on cross-examination by the prosecuting attorney and defendant gave the following answers.

Q. Now, you just testified under oath that you got that gun for your protection.

A. Yes, I did.

Q. Are you telling this jury that's the only reason you got that gun was for your protection?

A. Yes.

Q. You never loaned that gun out for anybody to go do a robbery?

A. I didn't loan it out for a robbery.

Q. You loaned it to Cornelius Johnson and Trey Alexander, your backseat passenger, and they went and did a robbery, didn't they?

A. I gave it to Cornelius because of all this going on and he was in danger also. He went against—that was bad judgment and I shouldn't have gave it to him, but he did that on his own and I told him before I gave him the gun, I said, "Don't do anything stupid."

Q. And he went and shot somebody, didn't he?

A. Yes, he did.

Q. And then he came back—

Defendant's trial attorney requested a bench conference at that point. He objected to the relevancy of the questions. He complained that the questions were "strictly prejudicial and no probative value to this particular incident."

The trial judge told defendant's trial attorney that he brought the matter up on his direct examination of defendant. The trial judge permitted the inquiry to continue, after which the prosecuting attorney inquired of defendant how long he had been without the gun. Defendant replied one night, but not the whole night. He said he did not know how many hours.

Defendant was asked, "So you didn't have that gun there for your protection when they were out with it, did you?" Defendant answered, "I went to St. Louis." Defendant said that was the only time he loaned the gun to anyone after getting the gun in July.

■ "The trial court has broad discretion over the relevancy and admissibility of evidence, and the trial court's determination on these issues will not be reversed absent an abuse of discretion." *State v. Collins*, 962 S.W.2d 421, 424 (Mo.App. 1998). The ruling about which defendant complains was not an abuse of discretion. Point III is denied.

■ Point IV asserts that the trial court committed plain error "in sentencing [defendant] to life imprisonment for armed criminal action because the court incorrectly noted at the sentencing hearing that the range of punishment for armed criminal action was thirty years to life," whereas the correct range of punishment is three years to life. At the sentencing hearing, the trial judge stated to defendant that because of defendant's prior criminal activity, the maximum sentence for the involuntary manslaughter conviction was 15 years. *See* § 558.016.7(3). The judge then stated the range of punishment for armed criminal action was "a minimum of thirty years and maximum of life in prison." Defendant was sentenced to 15 years for the offense of manslaughter in the first degree and to life in prison for the armed criminal action offense.

Section 571.015.1 declares the range of punishment for armed criminal action to be "imprisonment by the department of

corrections and human resources for a term of not less than three years."[3] This court perceives the situation of a trial court erroneously stating a range of punishment in which the minimum punishment is in excess to that prescribed by statute to be akin to a trial court erroneously concluding that an offense requires the sentence to be consecutive to another offense. In the latter instances, in armed criminal action cases, sentences have been set aside and the cases remanded for resentencing. *See State v. Treadway,* 558 S.W.2d 646 (Mo. banc 1977), *cert. denied,* 439 U.S. 838, 99 S.Ct. 124, 58 L.Ed.2d 135 (1978), *overruled on other grounds* by *Sours v. State,* 593 S.W.2d 208, 210 (Mo. banc 1980); *State v. Taylor,* 67 S.W.3d 713, 716 (Mo.App. 2002); *State v. Olney,* 954 S.W.2d 698, 700–01 (Mo.App.1997). It was plain error to sentence defendant on the basis of an erroneous range of punishment of 30 years to life when the applicable range is not less than three years. Point IV is granted. The sentence for the offense of armed criminal action is reversed. The case is remanded for resentencing on Count II of the amended information. The trial court is directed to exercise its judicial discretion by considering the entire range of punishment for that offense in imposing sentence on Count II.

The judgment of conviction is affirmed. The sentence for Count I is affirmed. The sentence for Count II is reversed and the case remanded for sentencing on Count II consistent with this opinion.

BATES, C.J., and SHRUM, J., concur.

---

**3.** "The statute indicates a minimum sentence of three years but does not state a maximum penalty. *Thurston v. State,* 791 S.W.2d 893, 895 (Mo.App.1990) noted, '[t]he absence of a stated maximum penalty merely indicates a legislative intent that a defendant convicted of the offense may be sentenced to *any* term of years above the minimum, including life. (Emphasis added.)'" *State v. Norton,* 949 S.W.2d 672, 678 (Mo.App.1997).