**STATE of Missouri, Plaintiff–Respondent,**

v.

**Zachary B. WHITELEY, Defendant–Appellant.**

**No. SD 29179.**

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 5, 2009.

Ferderick J. Ernst of Kansas City, MO, for Appellant.

Chris Koster, Atty. Gen., Jayne T. Woods, Asst. Atty. Gen. of Jefferson City, MO, for Respondent.

JEFFREY W. BATES, Judge.

Zachary Whiteley (Defendant) was charged by information with the class C felony of involuntary manslaughter in the first degree and the unclassified felony of armed criminal action (ACA). *See* § 565.024.1; § 571.015 RSMo (2000).[1] A jury found Defendant guilty of the lesser-included offense of involuntary manslaughter in the second degree, which is a class D felony, and ACA. *See* § 565.024.3–.4. The court imposed a three-year sentence on each count and ordered the sentences to run concurrently. Defendant's two points on appeal challenge the sufficiency of the evidence to support his convictions. As there is no merit in either point, the convictions are affirmed. Because the judgment incorrectly states that Defendant was convicted of the class C felony of involuntary manslaughter in the first degree, however, the cause must be remanded to correct that clerical error.

## I. Standard of Review

Both of Defendant's points on appeal contend that the trial court erred in denying Defendant's motion for judgment of acquittal at the close of all of the evidence. "When a criminal defendant challenges the sufficiency of the evidence to support a conviction, this Court's review is limited to determining whether sufficient evidence was admitted at trial from which a reasonable trier of fact could have found each element of the offense to have been established beyond a reasonable doubt." *State v. Reed,* 181 S.W.3d 567 (Mo. banc 2006). This Court views the evidence and all reasonable inferences derived therefrom in the light most favorable to the verdict; all contrary evidence and inferences are disregarded. *State v. Belton,* 153 S.W.3d 307, 309 (Mo. banc 2005). "We defer to the jurors' superior position to weigh and value the evidence, determine the witnesses' credibility and resolve any inconsistencies in their testimony." *State v. Lopez–McCurdy,* 266 S.W.3d 874, 876 (Mo.App.2008). The following summary of the evidence has been prepared in accordance with these principles.

## II. Factual and Procedural Background

In August 2005, Defendant and Tami Whittemore (Victim) began dating. By February 2006, they were living together in Defendant's mobile home. Victim was in the process of obtaining a divorce from her husband, who had harassed and made threats against both Defendant and Victim. Defendant purchased a revolver for Victim to use to protect herself. When Victim's father expressed concern about there being a gun in the house, Defendant said that there would never be a loaded gun at home. Defendant also said that he

---

1. Unless otherwise specified, all references to statutes are to RSMo Cum.Supp. (2005). All references to rules are to Missouri Court Rules (2009).

was an experienced hunter and had taken hunter safety courses.

The gun that Defendant purchased for Victim was a Rossi five-shot .38 revolver. When the gun was loaded, the cartridges were held in the cylinder. To unload the gun, the cylinder release button would be pressed. The cylinder then would fall open on the left side of the revolver. Cartridges could be removed from the cylinder two ways. One way was to use the ejector rod, which would eject all of the cartridges simultaneously when the rod was pushed backwards. When this method was used, it was not possible for any cartridges to remain in the cylinder. The other way to unload the cylinder was to open it, hold the gun in a vertical position and allow gravity to pull the cartridges out. Using this method would not always result in the cylinder being unloaded. If the cartridges fit snugly in the cylinder, gravity alone would not remove them. If the cylinder was not fully opened, it also was possible for a cartridge to be held in place by the flange on the left side of the revolver. Regardless of the unloading method that was used, a person could always verify that the gun was unloaded by visually inspecting the open cylinder before returning it to the closed position.

The revolver could be operated in either double-action or single-action mode. In double-action mode, the gun could be fired by simply pulling the trigger. This action cocked the hammer and then let it fall to fire the cartridge. In single-action mode, the hammer would be pulled back until it locked in the cocked position. The gun then would be fired by pulling the trigger. Once the hammer was cocked, the only way to decock the gun was to hold the hammer with one's thumb while simultaneously pulling the trigger and then slowly and carefully lowering the hammer to its resting position. When decocking a re-

volver in this fashion, there is always a chance of the gun going off because the gun will fire if the person's thumb slips off the hammer while the trigger is being pulled. Therefore, the gun must be pointed in a safe direction away from persons and property when the gun is being decocked.

On February 26, 2006, Defendant came running up to a neighbor's house yelling that his girlfriend had been shot. Defendant asked the neighbor to call 911. Defendant said he was showing Victim how to decock a gun when it fired and shot her. Defendant said he thought the gun was unloaded. Defendant and the neighbor returned to Defendant's mobile home. Victim was standing outside, leaning against a truck. She collapsed and died a few minutes later. Victim had a single gunshot wound that entered her stomach between her belly button and sternum and then exited out of her lower back. The bullet had damaged Victim's liver and one kidney. There was stippling around the entry wound, which indicated that the fatal shot had been fired from a distance of 30 to 36 inches away.

During the ensuing investigation, police officers entered the mobile home to secure the residence and collect evidence. There was a couch and a love seat in the living room. A Rossi five-shot .38 revolver was found on the couch. The gun had one empty shell casing in the cylinder, which indicated that the gun had been fired. Four live .38 cartridges were recovered on or near the couch. One cushion on the love seat had a small spot of blood on it. There was an entry and exit hole from a bullet in the cushion. There was another entry and exit hole in the back of the love seat itself. A spent bullet was located underneath the love seat.

In interviews at the scene with police, Defendant said the following. He was

showing Victim how to operate the revolver. Victim pointed the gun at Defendant and playfully pretended to shoot him. When Defendant realized that the gun was loaded, he took it away from Victim and told her not to point it at anyone. Defendant removed bullets from the gun and thought it was unloaded. He and Victim sat on the love seat. Defendant cocked the gun, which was pointing at Victim. As he was trying to show her how to decock the gun, his thumb slipped off of the hammer. The gun fired, and the bullet hit Victim in the stomach.

At trial, the State presented testimony from Kathleen Green (Green), a Missouri Highway Patrol lab analyst; and Detective Frank Duren (Duren), a trained firearms instructor. The following is a summary of their testimony.

Green opined that Victim had been killed by a bullet fired from the .38 Rossi revolver. She also tested the .38 Rossi revolver to see if it would accidentally discharge by striking the hammer with a mallet and by dropping the weapon on the floor. There were no accidental discharges during these tests. Finally, she tested the gun to determine whether it would fire during the decocking maneuver if she allowed her thumb to slip off of the hammer while she was pulling the trigger. She did this test three times, and the gun fired each time.

Duren testified that there are four basic safety rules for handling weapons: (1) the operator should treat every gun as if it were loaded, even if the operator has "double-checked a hundred times"; (2) if the weapon is off target, the operator's finger should be off of the trigger; (3) the operator should always know what the target is and what is beyond it; and (4) the operator should never point the firearm at any-

thing that he or she does not intend to shoot. Duren also testified that it was never appropriate to point a gun at someone who is being taught to use a weapon.

Defendant did not testify at the trial. His only witness was retired police officer Bucky Smith (Smith), who offered expert testimony about gun safety procedures. Smith opined that Victim's death resulted from two safety violations committed by Defendant. First, Defendant failed to physically and visually inspect the cylinder of the revolver to make sure the gun was unloaded before he began his demonstration. Second, Defendant should not have pointed the muzzle of the gun at Victim during the demonstration. Smith conceded that it was unsafe to teach someone how to use a gun while sitting on a couch with the muzzle pointed at the student. This practice is unsafe because the student could be struck by a bullet if the gun discharged.

The trial court instructed the jury on first-degree involuntary manslaughter, the lesser-included offense of second-degree involuntary manslaughter and ACA. The jury convicted Defendant of second-degree involuntary manslaughter and ACA. This appeal followed.

### III. Discussion and Decision

#### *Point I*

■ In Defendant's first point, he contends the trial court erred in denying Defendant's motion for judgment of acquittal at the close of all of the evidence as to the second-degree involuntary manslaughter offense. Defendant argues that the evidence was insufficient to support his conviction for second-degree involuntary manslaughter.[2] A person commits this crime

---

2. Defendant's point on appeal includes an assertion that the trial court erred in overrul-

ing a similar motion filed at the close of the State's evidence. We do not address that

"if he acts with criminal negligence to cause the death of any person." § 565.024.3. To find Defendant guilty of this offense, Instruction No. 7 required the jury to find the following elements beyond a reasonable doubt:

> First, that on or about February 26, 2006, in the County of Greene, State of Missouri, the defendant caused the death of Tami Whittemore by shooting her, and
>
> Second, that defendant was teaching her how to use a handgun and then shot her, and
>
> Third, that defendant was thereby criminally negligent[.]

"Criminally negligent" was defined for the jury as meaning the "failure to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow, and such failure constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." *See* MAI–CR 3d 314.14; § 562.016.5 RSMo (2000).

Defendant argues that: (1) there was no evidence of any act or omission in which he was negligent; and (2) even if the evidence was sufficient to support a negligent act or omission on his part, those acts or omissions do not constitute a gross deviation from the standard of care which a reasonable person would exercise in the situation. Neither argument has merit.[3]

Viewed in a light most favorable to the verdict, there was sufficient evidence from which a reasonable juror could have concluded beyond a reasonable doubt that Defendant was negligent and that his negligence constituted a gross deviation from the standard of care which a reasonable person would have exercised in the situation. Defendant was aware of the risk of having a loaded weapon in the house, and he assured Victim's father that such an event would not occur. Despite such assurance, Defendant did have a loaded revolver in his mobile home. He carelessly gave that loaded weapon to Victim, knowing that she did not know how to operate it. Defendant could have been killed when Victim pointed the gun at him and pretended to shoot him. Defendant became aware that the gun was loaded and took that weapon from Victim. Defendant was aware that a loaded gun should not be pointed at a person because that was exactly what he told Victim when he took the gun from her. Defendant is the one who removed bullets from the cylinder. He must have used the gravity unloading method because one bullet remained in the cylinder. This is a known risk associated with using the gravity unloading method. The jurors reasonably could have inferred that Defendant was negligent in: (1) failing to visually confirm that all of the cartridges had been removed from the cylinder before it was returned to its closed position; (2) failing to treat the gun as loaded, which it actually was, during the demonstration; (3) cocking a loaded gun while it was pointed directly at Victim; and (4) attempting to decock the loaded

---

issue because any such error was waived when Defendant presented evidence on his own behalf. *See State v. Still*, 216 S.W.3d 261, 265 n. 4 (Mo.App.2007).

**3.** In the argument section of Defendant's brief, he also appears to challenge Instruction No. 7 by arguing that "[e]xactly what the State was alleging that [Defendant] did or did not do that was negligent in this case is not clear as the verdict director did not specify what negligent acts or omissions allegedly lead to [Victim's] death." No such objection was presented below, and Defendant's brief does not contain a point challenging the giving of this instruction. An appellate court will not consider an alleged error that is raised for the first time only in the argument portion of an appellant's brief. *Dinwiddie v. State*, 905 S.W.2d 879, 881 (Mo.App.1995).

revolver while it was pointed at Victim when that maneuver inherently involved a substantial risk that the gun would discharge if Defendant's thumb slipped off of the hammer while the trigger was being pulled.

■ "[I]t is culpable, criminal negligence to point a gun at a human being, without having either known it was not loaded, or taken some precaution to ascertain it was not loaded." *State v. Morrison,* 104 Mo. 638, 16 S.W. 492, 494 (1891). As our Supreme Court noted in *State v. Belton,* 153 S.W.3d 307 (Mo. banc 2005), "[a]n accidental shooting, where the irresponsible use of a gun is shown, can support a finding of recklessness." *Id.* at 309. Similarly, in *State v. Jennings,* 887 S.W.2d 752 (Mo.App.1994), the western district of this Court determined that a defendant "took a substantial risk that the gun might discharge when he pulled back the hammer into the firing position." *Id.* at 754. Such an action was not only negligent, but "the jury could reasonably have found that [defendant] acted recklessly." *Id.* A *fortiori,* such evidence certainly would be sufficient to support the less culpable finding of criminal negligence.

We hold that there was sufficient evidence from which a reasonable juror could find beyond a reasonable doubt that Defendant's conduct created a substantial and unjustifiable risk of death to Victim and that such conduct constituted a gross deviation from the standard of care which a reasonable person would have been expected to exercise in the situation. Consequently, the trial court did not err in overruling Defendant's motion for judgment of acquittal at the close of all of the evidence. Point I is denied.

*Point II*

■ In Defendant's second point, he contends the trial court erred in denying Defendant's motion for judgment of acquittal at the close of all of the evidence as to the ACA offense.[4] Defendant argues that the evidence was insufficient to support his conviction for ACA. "[A]ny person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the crime of armed criminal action . . . ." § 571.015.1 RSMo (2000). To find Defendant guilty of ACA, Instruction No. 11 required the jury to find the following elements beyond a reasonable doubt:

> First, that defendant committed the offense of involuntary manslaughter in the second degree, as submitted in Instruction No. 7, and
>
> Second, that defendant committed that offense by or with or through, the knowing use or assistance or aid of a deadly weapon[.]

Defendant argues that the evidence was insufficient to demonstrate that he "knowingly used" the revolver in the commission of involuntary manslaughter. Defendant specifically argues that the State could not show knowing use because Defendant did not intend to fire the revolver. This argument, however, has already been rejected by our Supreme Court in *State v. Belton,* 153 S.W.3d 307 (Mo. banc 2005).

In *Belton,* the defendant was convicted of both first-degree involuntary manslaughter and ACA following an accidental shooting death. *Id.* at 309. Relying on § 562.021, the defendant argued that ACA required a mental state of purposeful or knowing conduct, and, therefore, could not

---

4. Defendant's point on appeal also contends that the trial court erred in overruling a similar motion filed at the close of the State's evidence. For the reason stated in n. 2, *supra,* we do not address that issue.

be submitted with the underlying felony of first-degree involuntary manslaughter, which required reckless conduct. *Id.* at 310. Section 562.021 provides in pertinent part:

[I]f the definition of any offense does not expressly prescribe a culpable mental state for any elements of the offense, a culpable mental state is nonetheless required and is established if a person acts purposely or knowingly; but *reckless* or *criminally negligent* acts do not establish such culpable mental state.

§ 562.021.3 RSMo (2000) (emphasis added).

The *Belton* court rejected the defendant's argument, holding that "[b]ecause section 571.015 specifically provides that it is applicable to 'any felony' committed with a deadly weapon, the culpable mental state of the underlying felony is irrelevant." *Belton,* 153 S.W.3d at 310. The Court further explained that "the culpable mental state of purposely or knowingly as imputed to armed criminal action applies only to the use of the weapon and not to the underlying felony." *Id.*; *see State v. Walton,* 166 S.W.3d 95, 98–99 (Mo.App. 2005). Here, there is no question that Defendant knew he was using a gun, which by definition is a deadly weapon. § 556.061(10); *see* § 571.015.1 RSMo (2000). Thus, the evidence was sufficient for a reasonable juror to find Defendant guilty beyond a reasonable doubt of ACA.[5]

The trial court did not err in overruling Defendant's motion for judgment of acquittal at the close of all of the evidence. Point II is denied.

 Although the foregoing discussion disposes of all of the issues presented by Defendant's appeal, one further matter requires our attention. The judgment included in the record on appeal contains a clerical error designating Defendant's conviction as a class C felony of first-degree involuntary manslaughter rather than a class D felony of second-degree involuntary manslaughter. § 565.024.4; *see State v. Woodmansee,* 203 S.W.3d 287, 294 (Mo. App.2006) (clerical error in judgment describing the class of felony of the underlying conviction). Rule 29.12 authorizes a trial court to correct a clerical error in a judgment resulting from oversight or omission. Rule 29.12(c); *Woodmansee,* 203 S.W.3d at 294. Accordingly, while we affirm Defendant's convictions and sentences, we must remand this case with instructions to the trial court to enter an amended written judgment reflecting Defendant's conviction of the class D felony of second-degree involuntary manslaughter.[6]

BARNEY, J., and SCOTT, P.J., Concur.

---

**5.** Defendant attempts to distinguish *Belton* by arguing that it involved reckless conduct only. We do not see that as a meaningful distinction. As the Supreme Court explained in *Belton,* the intent element of recklessness only applied to the underlying manslaughter felony. That intent element was irrelevant to the ACA conviction. *Belton,* 153 S.W.3d at 310. The ACA conviction was upheld because the defendant knew he was holding a deadly weapon when it fired and killed the victim. *Id.* at 310–11. We reach the same conclusion here. The intent element of criminal negligence only applies to the underlying manslaughter felony; it is irrelevant to the ACA conviction. The jurors could reasonably infer that Defendant knew he was holding a deadly weapon when it fired and killed Victim, which is sufficient to prove the required culpable mental state for an ACA conviction. *See id.*

**6.** This error does not require resentencing because the three-year term imposed for the involuntary manslaughter conviction was within the allowable range of punishment for

a class D felony. *See* § 558.011(4) (providing that the sentence for a class D felony should not exceed four years).