STATE Of Missouri, Plaintiff–Respondent,

v.

Christopher J. HINES, Defendant–Appellant.

No. SD 30845.

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 3, 2012.

William J. Swift, Assistant Public Defender, Columbia, MO, for Appellant.

Chris Koster, Attorney General, and Evan J. Buchheim, Assistant Attorney General, Jefferson City, MO, for Respondent.

### GARY W. LYNCH, P.J.

Christopher J. Hines ("Defendant") was found guilty by a jury of the class C felony of child abuse, *see* section 568.060, and sentenced to a term of fifteen years' incarceration in the Department of Corrections.[1] On appeal, Defendant makes two claims: first, the evidence was insufficient to establish that he inflicted cruel and inhuman punishment and that he did so knowingly, and, second, the trial court erred in refusing to instruct the jury on endangering the welfare of a child in the second degree as a lesser-included offense. Finding no merit in either claim, we affirm.

### Factual and Procedural Background

The evidence, viewed in the light most favorable to the verdict, *State v. Wilson*, 359 S.W.3d 60, 65 (Mo.App.2011), established the following. Defendant and Cary White had an on-and-off relationship that began when they were in high school. They had a son and a daughter together. Their daughter (hereinafter "Child") is the victim in this case.

In 2005, Defendant and White's intimate relationship ended. In 2007, White began dating Jacob Logan, and they later moved in together. Nevertheless, between 2005 and October 2009, Defendant and White remained friendly, and Defendant intermittently participated in his children's lives. During a period when Defendant was unemployed in 2008, he stayed at the home White and the children shared with Logan. However, during his stay, Defendant drank heavily, and when the living situation became "very conflictual [sic] and

---

1. References to section 568.060 are to RSMo 2000.

chaotic" for White and the children, she asked Defendant to leave.

White believed that it was important for the children to have a relationship with their father, and in July 2009, when Defendant was again unemployed, White allowed Defendant to return to live with them. Defendant lived in the garage and helped to get the children ready for school and sometimes cared for them after school. White and Logan, who were both employed, financially supported the household. Defendant had a girlfriend at the time, Felicia Black, whom White and Logan allowed to visit Defendant in their home.

Shortly after Defendant's return in 2009, the situation in the home again became chaotic. White testified that Defendant drank heavily, "had taken over ... [h]e was the king, he said[,]" and she began to feel like it was not her home anymore. Logan testified that Defendant berated their parenting of the children and "steamrolled" over them, and became increasingly assertive. When he drank alcohol, he often drank too much and became "unruly" when he did not get his way.

On the evening of October 9, 2009, White was resting in her bedroom while Defendant, Black, and Child were in the living room. Logan was in the kitchen getting dinner ready. Defendant had already consumed several beers and was wrestling and rough-housing with Child. The playfulness escalated to a point that Child became scared and upset and wanted Defendant to stop. She began yelling at Defendant to stop tickling her, started crying, and attempted to get away. Black and Logan both told Defendant to stop, but he continued while Child kicked and flailed her arms to keep him off of her. Two or three times, she threw a stuffed animal or toy at Defendant. When she hit him with one, she ran from Defendant down the hallway into her mother's bedroom as Defendant chased after her.

When Child ran into White's room, she was screaming, panicking, and very afraid. According to White, Defendant was angry and told Child, "I'm going to get you for this. You are going to pay." Child jumped onto White's bed and tried to hide behind her mother. A CPAP machine,[2] to which a hose and mask were attached, sat on a table by the bed. Defendant grabbed the hose and "wrapped the hose around [Child's] neck and pulled with both hands." Although she tried, White "could not get [her] fingers between the hose and [Child's] neck, it was so tight." White "could see that [Child's] eyes were kind of rolling back in her head. She was having trouble breathing." When White was able to insert her finger between Child's neck and the hose and release the tension, Child "fell to the bed[,]" gasping for air. Once she recovered her breath, Child then began yelling at Defendant. Defendant smacked her in the mouth so hard she almost fell off the bed. At that point, White, who was angry and upset, told Defendant to leave, get out of her house and away from her children. Defendant told her he was not going anywhere. Defendant was cursing and angry. White and Logan asked Black to get Defendant out of there, but she refused.

Defendant, Logan, and White stepped outside onto the back porch to discuss what had happened. Defendant kept telling everyone not to overreact and then told Logan that if he "called the police, if [Defendant] spent an hour, even an hour in jail, that he would hunt [Logan] down and kill him." Defendant then went outside to the driveway and began deflating tires on

2. CPAP is an acronym for continuous positive airway pressure.

White's vehicle, while shouting and "making a scene." Defendant threatened to slash the tires on all of the vehicles there because he did not want anyone to leave. White sent a text message to a neighbor to ask her to call the police and report a domestic disturbance.

About that time, Catherine Nall, a friend of White's, arrived with her daughter. When they exited their vehicle, Defendant approached her and told her she "needed to burn out." She ignored him and walked toward the front door. Defendant told her if she did not leave, he would slash her tires.

Nall called the police. When the police arrived, Defendant left through the back door and told Logan, who was in the kitchen, that he was "fucking dead[.]" Police searched the house and garage for Defendant but could not find him nearby.

The adults present were questioned together by the police regarding allegations that Defendant had a knife with which he was slashing tires on the vehicles and threatening harm if police were contacted. Initially, while in Black's presence, White was hesitant to divulge much information or to agree to press charges against Defendant. When Black was allowed to go inside the house to get her cell phone, White indicated to an officer that she wanted to cooperate and pursue charges. Black returned to the front doorway with her cell phone in hand, and Nall suggested to the police that Black might be in contact with Defendant. Black resisted handing her phone to an officer when he first requested to see it, and when she did comply as requested, the officer retrieved a text message sent by Black to Defendant telling him "it was okay to come back because nobody had said anything about [Child]." When the officer made contact with Child,

who was inside the house, Child reported the choking incident. The officer observed "a red mark on the lower right side of her neck and [it] looked like one . . . was kind of developing on the left side." He later photographed Child's neck.

Defendant was later located two blocks away and placed under arrest. After Defendant was read his rights, he told the officer that Child "had kicked him 11 times and sometimes he goes too far." At police headquarters, Defendant told an officer "that he wanted to get in a cell quick because he wanted to hit something. . . . He was very irate. . . . [and] said that if he were abused, he was small, but he could get out of his handcuffs and whip my ass." Once he was in a cell, Defendant "[b]egan screaming, kicking, and hitting the walls." The Children's Division was contacted regarding the incident, and an investigator met with Child on October 10, 2009, "at least 18 hours after the incident."

In its felony information, the State charged Defendant with abuse of a child. *See* section 568.060.1(1). The State alleged that Defendant "knowingly inflicted cruel and inhuman punishment upon [Child], a child less than seventeen years old, by wrapping a hose around [Child's] neck." The State further alleged that Defendant was a prior and persistent offender, in that he had previously been convicted of felony abuse of a child in December 2005 and felony second-degree domestic assault in September 2005.

Defendant's trial was held June 7 through 10, 2010. At the close of all of the evidence, Defendant moved for a judgment of acquittal, which the trial court overruled. Counsel for Defendant requested the submission of an instruction for endangering the welfare of a child in the second degree, *see* section 565.050.1,[3] as a lesser-

---

**3.** References to section 565.050 are to RSMo     Cum.Supp.2005.

included offense to the charge of abuse of a child, which the trial court refused. The jury returned a guilty verdict, and the trial court sentenced Defendant to serve fifteen years in the Department of Corrections. Defendant appeals, bringing two claims of trial court error.

### Point I—Sufficient Evidence Supports Conviction

In his first point, Defendant contends that the trial court erred in denying his motion for judgment of acquittal at the close of all of the evidence,

> in that the evidence did not prove beyond a reasonable doubt that [Defendant's] putting the CPAP machine's hose around [Child's] neck constituted the inflicting of cruel and inhuman punishment and that [Defendant] knew his conduct was inflicting cruel and inhuman punishment, *as respondent's evidence showed* that [Defendant] used the hose to bring his daughter … within his reach because she was jumping on her mother's bed while she used her mother as a shield placed between her and [Defendant] to avoid [Defendant] being able to reach her to spank her, the photos of [Child's] neck Officer Smith took the night of the incident do not show any visible injury to [Child], and Child Investigator Richardson found no visible marks the next day.

(Emphasis added).

The premise upon which Defendant builds his point, however, is flawed in that it does not comport with our standard of review but rather inverts it. In his point and in his supporting argument, Defendant relies upon an inference drawn from the State's evidence contrary to the jury's verdict and disregards all of the evidence and inferences favorable to it. Accordingly, Defendant ignores the relevant standard of review and the jury's duty to determine the credibility of the witnesses.

In a challenge to the sufficiency of evidence supporting a criminal conviction, this Court defers to the jury's superior position to weigh and evaluate the evidence, determine the credibility of the witnesses, and resolve inconsistencies in the testimony presented. *State v. Whiteley,* 294 S.W.3d 114, 115 (Mo.App.2009). We limit our review to a determination as to whether there was sufficient evidence presented to establish each element of the offense beyond a reasonable doubt. *Id.* Accordingly, we view the evidence and all reasonable inferences derived therefrom in the light most favorable to the verdict, and we disregard all contrary evidence and inferences. *Id.*

This court does not reweigh the evidence, nor do we determine the credibility of witnesses. *State v. Simmons,* 270 S.W.3d 523, 527 (Mo.App.2008). "It is not our function to resolve conflicts in the evidence and decide the credibility of witnesses to determine whether the defendant is guilty beyond a reasonable doubt[.]" *State v. Still,* 216 S.W.3d 261, 263 (Mo. App.2007). "Reliability and credibility are issues for the jury[,]" *State v. Meuir,* 138 S.W.3d 137, 139 (Mo.App.2004), in addition to weight-of-the-evidence determinations, *State v. Hobbs,* 106 S.W.3d 498, 509 (Mo. App.2003). "The jury, as fact finder, may choose to accept or reject all, some, or none of the testimony of any witness." *Id.* Upon appellate review, when the evidence admitted could support " 'two equally valid inferences, only the inference that supports the finding of guilt can be considered.' " *State v. Breedlove,* 348 S.W.3d 810, 814 (Mo.App.2011) (quoting *State v. Latall,* 271 S.W.3d 561, 568 (Mo. banc 2008)).

When this court addresses a claim challenging the sufficiency of the evidence, we "look to the elements of the crime and consider each in turn." *State v. Naasz*, 142 S.W.3d 869, 875 (Mo.App.2004). "[T]here must be sufficient evidence of each element of the offense." *State v. Dixon*, 70 S.W.3d 540, 544 (Mo.App.2002). "The elements of an offense are derived from the statute establishing the offense or, when relevant, common law definitions." *Id.* Section 568.060.1(1) provides that "[a] person commits the crime of abuse of a child if such person: (1) [k]nowingly inflicts cruel and inhuman punishment upon a child less than seventeen years old[.]" Punishment has been defined as "'severe, rough, or disastrous treatment.'" *Breedlove*, 348 S.W.3d at 814 (quoting *State v. Silvey*, 980 S.W.2d 103, 108 (Mo.App.1998)).

Defendant contends that the State failed to prove he knowingly inflicted cruel and inhuman punishment, claiming that "respondent's evidence showed that [Defendant] used the hose to bring his daughter ... within his reach[.]" Contrary to Defendant's evidence and his contention here, however, the State's evidence, viewed in a light favorable to the verdict, established that Defendant wrapped the CPAP machine's hose around Child's neck to punish her. Child testified that after Defendant angrily chased her into her mother's bedroom, Defendant grabbed the hose "and choked [her]." When asked to explain how Defendant placed the hose around her neck, Child indicated that Defendant crossed the hose and pulled each end. Child further stated that it hurt, she could breathe "[a] little[,]" and she was scared, she said, because she "didn't want to die." When the hose was released, she "was crying, and [she] yelled at him, and then he smacked [her] mouth." White

testified that Defendant "came into the room, looked around, grabbed the hose from ... [the] breathing machine, and wrapped it around [Child's] neck." When White was asked to recall "how the defendant was holding the hose around her neck[,]" she testified, "He is right-hand dominant. He was pulling with his right hand and holding with his left." White stated she tried to get her fingers in between the hose and Child's neck "so that she could breathe. I could see that her eyes were kind of rolling back in her head. She was having trouble breathing." When the hose was finally released, Child "fell to the bed ... had trouble breathing ... was gasping for air." Then, when she regained her breath, she started screaming at Defendant, and he "reached out and smacked [Child] in the mouth." White testified that Child "nearly fell off the bed backward."

According to section 562.016.3(1),[4] a person acts knowingly "[w]ith respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist." "With respect to a result of his conduct[,]" a person acts knowingly "when he is aware that his conduct is practically certain to cause that result." Section 562.016.3(2). While direct evidence of intent is rarely available, "intent may be established by circumstantial evidence." *Breedlove*, 348 S.W.3d at 815. For instance, intent may be inferred "from the surrounding facts or from the act itself" or from a defendant's tendency to conceal the offense or his role therein. *Still*, 216 S.W.3d at 267. Also, "admissions of a criminal defendant are direct proof of guilt." *Id.*

Here, the testimony of Child and White is sufficient to establish that Defendant acted knowingly. When Defendant en-

4. References to section 562.016 are to RSMo 2000.

tered the room he looked around, identified the CPAP hose, grabbed the hose, wrapped it around Child's neck, held one end with his left hand, and commenced pulling the other end with his right hand. Then, when White initially attempted to alleviate the choking effect of his actions and Child's eyes began rolling back, Defendant continued to pull on the hose until White managed to get her fingers under the hose and stop the choking effect, at which time Defendant released the hose.

In addition, after the incident, before his arrest Defendant tried to intimidate the other adults present to keep them from calling the police and reporting his choking of Child, and after his arrest, Defendant volunteered to an officer "that [Child] had kicked him 11 times and *sometimes he goes too far.*" (Emphasis added). From above recited direct evidence, the jury could have reasonably inferred that Defendant was aware of and knowingly intended the choking nature of his conduct and that his conduct was not only practically certain to cause that result but was actually doing so at that time.

■ As to his remaining claim in this point—the State failed to prove "that [Defendant's] putting the CPAP machine's hose around [Child's] neck constituted the inflicting of cruel and inhuman punishment[ ]"—Defendant argues that photographic evidence and certain testimony established that no "readily discernible injury" was apparent on Child's neck following the incident. Defendant cites to *State v. Biggs,* 333 S.W.3d 472 (Mo. banc 2011), and *State v. Lauer,* 955 S.W.2d 23 (Mo. App.1997). Both cases, Defendant contends, support his contention that "[t]he lack of any discernible injury establishes respondent failed to prove [Defendant] inflicted cruel and inhuman punishment."

Logan testified that Child came out of the bedroom holding her hand to her neck, and she "had a red mark that went all the way around her neck about … [an] inch, inch and a half wide or so" immediately after the incident. Logan agreed they were "highly visible marks[.]" He further stated, "[I]t was a couple of days[ ]" before the marks went away. Child's mother testified that she observed faint red marks on Child's neck.

Photographs taken of Child's neck by an officer following the choking incident were admitted into evidence by the State at Defendant's trial. While no noticeable marks can be discerned in these photographs, the officer who photographed Child's neck testified that he observed marks on her neck when he interviewed her shortly following the incident. The officer also testified that he "saw a—a red mark on the lower right side of her neck and looked like one that was kind of developing on the left side." He further stated that the marks were visible enough so he could plainly see them without Child having to say anything. In addition, he testified when the photographs were projected for the jury that he could see the marks caused by the hose more clearly in person.

Ignoring all testimony regarding the existence of a physical injury as demonstrated by the existence of red marks on Child's neck, however, Defendant asserts that the testimony that no marks were visible from the investigator with the Children's Division, who interviewed Child the following day, demonstrates that the evidence was insufficient to find that his actions were cruel and inhuman punishment. However, the same investigator also testified that sometimes there are no visible injuries when a child has been choked and that she did not see Child until "at least 18 hours after the incident"; the jury was free to credit and believe this testimony.

While Defendant cites to the case of *Biggs* for the proposition that "evidence of persistent bruising is sufficient proof of cruel and inhuman punishment," Defendant ignores that the Court also noted there that the charge of abuse of a child does not require proof of physical injury; "[a]buse of a child requires establishment of cruel and inhuman punishment as well as the age of the victim." 333 S.W.3d at 479. Each case must be judged on its own facts. *Breedlove*, 348 S.W.3d at 815. "[A]lthough the majority of child abuse cases involve some sort of physical injury, ... it is not required to be proven by any provision of the statute." *State v. Horton*, 325 S.W.3d 474, 480 (Mo.App.2010). "[C]hild abuse is defined to prevent cruel and inhuman punishment toward children, whether it results in physical injury or not." *Id.* Section 568.060 is further "intended to prevent abusive and punitive conduct which causes serious emotional injury to a child." *State v. Dunson*, 979 S.W.2d 237, 243 (Mo.App.1998).

Here, there was sufficient evidence to establish that by knowingly choking her with a hose around her neck until her eyes rolled back and she became afraid that she was going to die, Defendant inflicted cruel and inhuman punishment upon Child. Point I is denied.

### Point II—No Instructional Error

In his second point, Defendant asserts the trial court erred in refusing to instruct the jury on second-degree endangering the welfare of a child, which Defendant contends is a lesser-included offense of abuse of a child. Defendant claims there was

> evidence to acquit [Defendant] of the higher offense of child abuse and to convict him on the lower offense of endangering the welfare of a child in the

second degree because the jury could have believed he acted with criminal negligence exposing [Child] to substantial risk to life, body or health when he used a CPAP hose to bring her within his grasp to spank her.

Section 556.046.1[5] defines lesser-included offenses:

> 1. A defendant may be convicted of an offense included in an offense charged in the indictment or information. An offense is so included when:
>
> (1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or
>
> (2) It is specifically denominated by statute as a lesser degree of the offense charged; or
>
> (3) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein.

"Section 556.046 is a legislative determination that an offense can be a lesser offense of another offense so that a charge of the greater will support a conviction of the lesser although the lesser is not necessarily included in the greater[.]" *State v. Wilkerson*, 616 S.W.2d 829, 833 (Mo. banc 1981).

> An offense is a lesser-included offense if it is impossible to commit the charged offense without necessarily committing the lesser. If the greater of the two offenses includes all of the legal and factual elements of the lesser, then the lesser is an included offense. However, if the lesser offense requires the inclusion of some necessary element not so included in the greater offense, the lesser is not necessarily included in the greater.

---

**5.** References to section 556.046 are to RSMo Supp.2001.

*State v. Greenlee,* 327 S.W.3d 602, 620–21 (Mo.App.2010) (internal citations and quotations omitted).

"Analysis of a lesser[-]included offense under section 556.046.1(1) focuses on the statutory elements of the offenses rather than upon the evidence offered at trial." *Horton,* 325 S.W.3d at 479. " 'The elements of the two offenses must be compared in theory without regard to the specific conduct alleged.' " *Id.* (quoting *State v. Derenzy,* 89 S.W.3d 472, 474 (Mo. banc 2002)). "If each offense requires proof of an element not required by the other offense, then neither is a lesser[-]included offense within the meaning of section 556.046.1(1)." *Horton,* 325 S.W.3d at 479.

The statute under which Defendant was charged provides, "[a] person commits the crime of abuse of a child if such person: (1) Knowingly inflicts cruel and inhuman punishment upon a child less than seventeen years old[.]" Section 568.060.1(1). The State had to prove that Defendant (1) knowingly inflicted; (2) cruel and inhuman punishment; (3) on a child younger than seventeen years old. *Biggs,* 333 S.W.3d at 479.

Section 568.050.1(1)[6] provides: "A person commits the crime of endangering the welfare of a child in the second degree if: (1) He or she with criminal negligence acts in a manner that creates a substantial risk to the life, body or health of a child less than seventeen years old[.]" To convict a defendant of this offense, the State must show that the defendant (1) acted with criminal negligence, (2) in a manner that creates a substantial risk to the life, body, or health, (3) to a child less than seventeen years old.

Comparing the elements of each offense demonstrates that the crime of second-degree child endangerment is not a lesser-included offense of abuse of a child because that crime contains an element—creating a substantial risk to the life, body, or health of a child—that is not present in the offense of abuse of a child. This element "is intended to prevent any and all types of conduct that involve substantial risk to a child[,]" which encompasses "many types of conduct other than punishment and abuse[.]" *Dunson,* 979 S.W.2d at 243. Similarly, the crime of abuse of a child contains an element—cruel and inhuman punishment—that is not found in the crime of second-degree child endangerment. This element "prohibits cruel and inhuman punishment even if it does not create a substantial risk to the life, body or health of a child." *Id.* Neither element is a subset of the other, *id.,* and for this reason, second-degree child endangerment under section 568.050.1(1) is not a lesser-included offense of abuse of a child under section 568.060.1(1). The trial court correctly declined to instruct the jury on endangering the welfare of a child in the second degree. Defendant's second point is denied.

### Decision

The trial court's judgment is affirmed.

NANCY STEFFEN RAHMEYER and WILLIAM W. FRANCIS, JR., JJ., Concur.

---

**6.** References to section 568.050 are to RSMo Cum.Supp.2005.